No. 55,722

David E. Jackson, *et al., Appellees,* v. City of Kansas City, Kansas, *et al., Appellants.*

(680 P.2d 877)

Opinion filed April 6, 1984.

*Daniel B. Denk,* of Kansas City, and *Annette Eslick,* assistant city attorney, argued the cause, and *Robert J. Watson,* city attorney, was with them on the briefs for appellant City of Kansas City, Kansas.

*Dennis L. Horner,* of Horner, Duckers & Cornwell, of Kansas City, argued the cause and was on the brief for appellee/cross-appellant Dan S. Freeman.

*Donald W. Vasos,* of Vasos, Kugler & Dickerson, of Kansas City, argued the cause, and *Charles D. Kugler* and *Stephen G. Dickerson,* of the same firm, were with him on the brief for appellee/cross-appellant Kermit Kitchen.

*David R. Hills,* of Harris, Hills & Hutton, of Kansas City, argued the cause, and *William W. Hutton,* of the same firm, was with him on the brief for appellee/cross-appellant David E. Jackson.

*Jay Thomas,* of Barnett & Ross, Chartered, of Kansas City, argued the cause and was on the brief for appellees Edgar M. Glover and Nellie Glover.

*Kevin E. Koch,* of Jenkins, Way, Turner & Vader, Chartered, of Kansas City, argued the cause, and *Rodney L. Turner,* of the same firm, was with him on the brief for counter-claimant/appellee Thomas DeKeyser.

The opinion of the court was delivered by

McFARLAND, J.: Defendant City of Kansas City, Kansas, brings this appeal from the verdict entered in a liability jury trial and the judgment entered in a bench damage trial. Six separate civil actions arising from a single occurrence were consolidated into the two trials. The incident which spawned the litigation was the September 10, 1979, collision between two City of Kansas City-owned fire trucks which were on emergency runs to the same fire. They had been dispatched from different fire stations. The collision occurred at the intersection of Fifth Street and Quindaro Boulevard in Kansas City, Kansas.

Four of the lawsuits were brought by injured firemen employed by the Kansas City, Kansas, Fire Department who were involved in the accident as either drivers of or passengers in one of the two fire trucks. In case No. 80C-12250, the driver of one of

the fire trucks, David E. Jackson, sued the City and Thomas G. DeKeyser, the driver of the other fire vehicle. DeKeyser counterclaimed against Jackson. In case No. 80C-13458 Kermit C. Kitchen, Jr., the acting captain in charge of the vehicle driven by DeKeyser sued the City and both drivers, DeKeyser and Jackson. Another fireman, Dan S. Freeman, who was riding on the vehicle driven by Jackson, sued the City and both DeKeyser and Jackson in case No. 81C-00020. In addition, Freeman filed a separate suit, No. 81C-3354, against another fire department employee, Raymond Cox, a dispatcher for the Kansas City, Kansas, Fire Department. (Although it was understood and agreed following discovery and pretrial that counsel for Freeman would seek dismissal of the lawsuit against Cox, no formal journal entry of dismissal has ever been filed in that action; hence its inclusion in this appeal.)

The two other actions were brought by persons who were not city employees who sustained personal injury and/or property damage in the accident. In case No. 80C-11499, Edgar M. Glover sued the City to recover money damages for himself and his wife for injuries sustained by him while stopped in his pickup truck at the intersection at the time of the collision. In case No. 80C-9498, Mr. and Mrs. Earl McCord sued the City to recover for damage to their building located on the corner of the collision intersection.

The jury assessed fault as follows: Jackson—35 percent; Kitchen—10 percent; DeKeyser—35 percent; and City of Kansas City—20 percent. The trial court ruled the $500,000.00 limit of liability set forth in K.S.A. 1979 Supp. 75-6105 of the Kansas Tort Claims Act (K.S.A. 1983 Supp. 75-6101 *et seq.*) was equally applicable to governmental entities and their employees and apportioned damages within that limit as follows: Jackson—$87,750.00; DeKeyser—$1,500.00; Kitchen—$119,750.00; Freeman—$203,750.00; Edgar M. and Nellie Glover—$79,750.00; and Earl and Elizabeth J. McCord—$7,500.00.

In its appeal, the defendant City claims error by the trial court in its rulings relative to denial of immunity under the Kansas Tort Claims Act, K.S.A. 1983 Supp. 75-6101 *et seq.*; certain common law defenses; damages; indemnification; and jury instructions. In their cross-claims, claimants contend the trial court erred in limiting the total damage claim to $500,000.00.

We turn now to the issues.

I. DID THE DISTRICT COURT ERR IN RULING THE CLAIMS OF THE PLAINTIFFS AND COUNTER-CLAIMANTS AGAINST THE CITY AND ITS EMPLOYEES WERE NOT BARRED BY THE PROVISIONS OF THE KANSAS TORT CLAIMS ACT (K.S.A. 1983 SUPP. 75-6101 *et seq.*)?

Defendant City contends the district court erred in ruling the City and its employees were not immune from suit under the exceptions set forth in sections (*a*), (*c*), (*d*) and (*m*) of K.S.A. 1983 Supp. 75-6104 of the Kansas Tort Claims Act. Additionally, the City contends the trial court erred in refusing to apply a 1981 amendment to K.S.A. 1979 Supp. 75-6104(*f*) retrospectively and grant immunity thereunder.

We shall first consider the alleged error predicated upon K.S.A. 1983 Supp. 75-6104(*f*)(2). This statute, in the form in effect at the time of the collision (K.S.A. 1979 Supp. 75-6104[*f*]), provided a governmental entity or an employee acting within the scope of his or her employment would not be liable for damages resulting from:

"(*f*) any claim by an employee of a governmental entity arising from the tortious conduct of another employee of the same governmental entity, if such claim is compensible pursuant to the Kansas workmen's compensation act."

It is undisputed the firemen herein were not entitled to workers' compensation pursuant to the Kansas Workmen's Compensation Act, K.S.A. 44-501 *et seq.*

At this point some background information must be provided. In 1975 the Kansas Legislature amended K.S.A. 1974 Supp. 44-505 of the Workmen's Compensation Act to permit a Firemen's Relief Association, by a majority vote of its members, to exclude such members from the Act. L. 1975, ch. 259, §§ 1, 2. On July 14, 1975, the Firemen's Relief Association of Kansas City, Kansas, by a majority vote of its members, elected to exclude its members from the Workmen's Compensation Act. On January 26, 1979, the Board of City Commissioners of Kansas City, Kansas, permitted the Firemen's Relief Association to exclude its members from the Act by a formal agreement executed pursuant to K.S.A. 1975 Supp. 44-505d. Upon the exclusion of the Firemen's Relief Association members from the provisions of the Workmen's Compensation Act, an endorsement was added to the

City's workers' compensation insurance policy removing Firemen's Relief Association members from its coverage. On September 10, 1979, the date of the collision, the firemen of the Kansas City, Kansas, Fire Department were not covered by workers' compensation but were subject to the Firemen's Relief Association of Kansas City.

On February 10, 1981, Senator Jack Steineger, of Kansas City, introduced Senate Bill No. 235. The bill was duly enacted into law and made effective as of July 1, 1981. Senate Bill No. 235 amended K.S.A. 1979 Supp. 75-6104(f) by adding the following emphasized language:

"(f) any claim by an employee of a governmental entity arising from the tortious conduct of another employee of the same governmental entity, if such claim is (1) compensible pursuant to the Kansas workmen's compensation act *or (2) not compensible pursuant to the Kansas workmen's compensation act because the injured employee was a firemen's relief association member who was exempt from such act pursuant to K.S.A. 44-505d at the time the claim arose.*" (Emphasis supplied.) L. 1981, ch. 357, § 1.

There can be little doubt but the 1981 amendment to K.S.A. 1979 Supp. 75-6104(f) was prompted by this litigation. Hearing on S.B. 235 before the Senate Judiciary Committee, February 25, 1981 (Statement by Kansas City, Kansas, Assistant City Attorney Peters, p. 3). The City contends the district court erred in not applying this 1981 amendment retrospectively and thereby baring the firemen's claims herein.

Did the 1981 Kansas Legislature intend K.S.A. 1981 Supp. 75-6104(f)(2) to apply retrospectively to September 10, 1979? Defendant City, without citing a single document in the legislative record, contends the 1981 legislature intended K.S.A. 1981 Supp. 75-6104(f)(2) to relate back nearly two years to bar this action. An examination of the files of the Senate and House judiciary committees for 1981 reveals no indication that such was the legislative intent of Senate Bill No. 235. Even assuming the legislature had explicitly stated the bill was to relate back, the retrospective application might not be valid. In *Eakes v. Hoffman-LaRoche, Inc.*, 220 Kan. 565, 552 P.2d 998 (1976), this court said:

"The general rule followed in this jurisdiction is that a statute will operate prospectively rather than retrospectively unless its language clearly indicates that the legislature intended the latter, and that retrospective application will not be given where vested rights will be impaired. (*Johnson v. Warren*, 192 Kan. 310,

387 P.2d 213; *Ward v. Marzolf Hardwood Floors, Inc.,* 190 Kan. 809, 378 P.2d 80; *Pinkston v. Rice Motor Co.,* 180 Kan. 295, 303 P.2d 197; *Ellis v. Kroger Grocery Co.,* 159 Kan. 213, 152 P.2d 860, 155 A.L.R. 546.)" 220 Kan. at 568.

In *Hendrix v. City of Topeka,* 231 Kan. 113, 643 P.2d 129 (1982), this court, in refusing to apply the Kansas Tort Claims Act to an action which occurred before the effective date of the act, declared the court has consistently held that a statute does not operate retrospectively, but only prospectively, unless the intention of the legislature is clearly expressed by the statute that its provisions are to be applied retrospectively. 231 Kan. at 116. In the instant action there is no clear legislative expression K.S.A. 1981 Supp. 75-6104(*f*)(2) was to be applied retrospectively.

We conclude the trial court did not err in holding the 1981 amendment to K.S.A. 1979 Supp. 75-6104(*f*) should not be applied retrospectively to bar the firemen's claims herein.

We turn next to the issue as it relates to K.S.A. 1983 Supp. 75-6104(*a*) which grants immunity for:

"Legislative functions, including, but not limited to, the adoption or failure to adopt any statute, regulation, ordinance or resolution."

One of the allegations of negligence against the defendant City was that city employees had not complied with certain regulations and ordinances it had enacted relative to the operation of fire trucks and such noncompliance was a cause of the collision. Nowhere is there any allegation the City was negligent in adopting or failing to adopt any statute, regulation, ordinance or resolution. Illustrative of the type of claim being made herein is the allegation that at least one of the fire trucks was, at the time of the collision, exceeding the maximum 35 m.p.h. speed limit fixed by Fire Department Bulletin No. 176. We do not believe an employee's compliance or noncompliance with his employing department's rules and regulations relative to the operation of an emergency vehicle is within the legislative function exception (K.S.A. 1983 Supp. 75-6104[*a*]) of the Kansas Tort Claims Act.

As we noted in *Cook v. City of Topeka,* 232 Kan. 334, 654 P.2d 953 (1982), relative to subsection (*a*):

"Said definition of legislative function is obviously not a blanket exemption of each act of every employee of every state, county, or municipal governmental entity simply because the employing governmental entity may exercise legislative powers." 232 Kan. at 337.

It is rather farfetched to argue that a fire truck driver operating his vehicle on a fire alarm call is exercising a legislative function within the purview of subsection (a). One commentator on how the Kansas Tort Claims Act affects school districts has provided the following example of a situation where K.S.A. 1983 Supp. 75-6104(a) would seem to be applicable:

"The following hypothetical illustrates the applicability of the exception to school districts. In this hypothetical, school board members meet at a regularly scheduled meeting to discuss a resolution to adopt the requirement that all driver's education cars carry protective air-bag devices. The resolution fails, the cars are not so equipped, and a student driver is injured in an accident. The parents sue, alleging that no injury would have occurred had airbags been installed, and that the school board's action in failing to pass the resolution was therefore the proximate cause of the student's injury.

"The district should raise section 6104(a) as a defense, which in the example given, would probably be successful since the failure to adopt the particular resolution is a specifically enumerated, legislative function." Comment, The Kansas Tort Claims Act and School Districts, 28 Kan. L. Rev. 619, 625 (1980).

We conclude the trial court did not err in holding K.S.A. 1983 Supp. 75-6104(a) did not afford immunity to the City or its employees on the claims filed herein.

We turn now to K.S.A. 1983 Supp. 75-6104(c) which grants immunity for:

"enforcement of or failure to enforce a law, whether valid or invalid, including, but not limited to, any statute, regulation, ordinance or resolution."

The City argues liability predicated upon the failure of one of its employees to abide by a departmental regulation governing physical operation of emergency vehicles is the equivalent of failure to enforce a regulation. We do not agree.

Lantz v. City of Lawrence, 232 Kan. 492, 657 P.2d 539 (1983), discusses K.S.A. 1981 Supp. 75-6104(c). Lantz involved a City of Lawrence weed abatement ordinance. On numerous occasions the City informed Mr. and Mrs. Lantz they were in violation of the ordinance. After unsuccessful attempts to have the Lantzes voluntarily comply with the city ordinance, the City sent a work crew to the Lantz property and removed not only weeds, but, according to plaintiffs, many trees. The City also sent two policemen to assure no breach of the peace. The Lantzes sued alleging negligence and conversion. The City moved for summary judgment under K.S.A. 1981 Supp. 75-6104(c). The district court granted defendant's summary judgment motion. On appeal

this court affirmed in part and reversed in part. As to the two city police officers who had been sent to the Lantz property to assure no breach of peace, this court said the policemen were clearly acting within the scope of their employment in the enforcement of a law under the provisions of K.S.A. 1981 Supp. 75-6104(c). 232 Kan. at 495. As to the city employees who cut down the trees this court held summary judgment was improper because, in drawing all reasonable inferences from plaintiffs' factual statement, a material issue of fact emerged concerning whether the city employees' actions of cutting down the trees was within the purview of the city's weed abatement ordinance. We stated:

"If at trial it is determined the city employees' actions giving rise to this lawsuit were outside the purview of the ordinance, the exception contained in 75-6104(c), exempting governmental entities from liability where damage results from the enforcement of a law, is inapplicable. K.S.A. 1981 Supp. 75-6103(a) therefore would apply and the city and defendants Osborne and Demby could be held liable if their actions are determined at trial to be negligent or wrongful." 232 Kan. at 497.

K.S.A. 1983 Supp. 75-6104(c) apparently is designed to preclude an action such as arose in *Everly v. City of Gas*, 95 Kan. 305, 147 Pac. 1134 (1915). The City of Gas had passed an ordinance which prohibited cattle from running at large. Plaintiff was injured when she was attacked by a vicious cow. Plaintiff sued the City alleging it had been negligent in not enforcing its ordinance. This court rejected plaintiff's claim holding a city was not liable in a civil action for damages for failure of its officers to enforce a governmental ordinance enacted in the interest of public welfare. 95 Kan. 305, Syl. ¶ 1. See also *Warden v. City of Wichita*, 232 Kan. 838, 841, 658 P.2d 1043 (1983), citing *Everly*.

Examples of other situations where subsection (c) might be successfully asserted would be: (1) an action against a city for damages to a garden predicated upon a city's failure to enforce a dog leash law; and (2) an action against a city by an individual arrested for violation of an anti-loitering ordinance based upon the fact the ordinance had later been held to be invalid. This construction is in accord with *Cansler v. State*, 234 Kan. 554, 675 P.2d 57 (1984), wherein we stated:

"We construe K.S.A. 1981 Supp. 75-6104(c) to provide an exemption from claimed liability only where claimant's sole asserted claim of causal negligence is the public entity's enforcement or failure to enforce a law. That section does not provide an exemption where the agency, in enforcing or failing to enforce a

law, commits some additional tortious act or omission *which would be negligence at common law*, and which act or omission causes damage." 234 Kan. at 568. (Emphasis supplied.)

Obviously, the claim of negligence herein relative to driving at an excessive speed, driving without due regard for the safety of others, etc. would be negligence at common law.

In construing subsection (c) and all other exemptions specified in K.S.A. 1983 Supp. 75-6104, it should be borne in mind the Kansas Tort Claims Act takes an open-ended approach to governmental liability. In other words, liability is the rule while immunity the exception. This approach is consistent with the general principle of law that for negligent or tortious conduct, liability is the rule, immunity the exception. *Durflinger v. Artiles*, 234 Kan. 484, 501, 673 P.2d 86 (1983); *Noel v. Menninger Foundation*, 175 Kan. 751, 762, 267 P.2d 934 (1954). K.S.A. 1983 Supp. 75-6103(a) declares:

"Subject to the limitations of this act, each governmental entity shall be liable for damages caused by the negligent or wrongful act or omission of any of its employees while acting within the scope of their employment under circumstances where the governmental entity, if a private person, would be liable under the laws of this state."

K.S.A. 1983 Supp. 75-6104 contains the immunity exceptions to the general rule of governmental liability. In *Broadhurst Foundation v. New Hope Baptist Society*, 194 Kan. 40, 397 P.2d 360 (1964), this court observed ordinarily a strict or narrow interpretation must be applied to statutory exceptions. 194 Kan. at 44. In construing a statute, any doubt should be resolved against the exception, and anyone claiming to be relieved from the statute's operation must establish it comes within the exception. In other words, the burden is not upon the claimants herein to establish the defendants do not come within one or more of the K.S.A. 1983 Supp. 75-6104 exceptions. Rather, the burden is upon the defendant governmental entity, or defendant employee, to establish governmental immunity under one or more of the exceptions of K.S.A. 1983 Supp. 75-6104. If the party claiming this exception cannot meet this burden, the general rule of liability, in K.S.A. 1983 Supp. 75-6103, governs.

We conclude the district court did not err in holding the defendant City had not met its burden of establishing it and its defendant employees enjoyed immunity for the claims herein under subsection (c) of K.S.A. 1983 Supp. 75-6104.

We turn next to K.S.A. 1983 Supp. 75-6104(*d*) which grants immunity for:

"any claim based upon the exercise or performance or the failure to exercise or perform a discretionary function or duty on the part of a governmental entity or employee, whether or not the discretion be abused."

Both fire trucks were being operated as emergency vehicles at the time of the collision. Their drivers were therefore subject to K.S.A. 8-1506 which provides:

"(*a*) The driver of an authorized emergency vehicle, when responding to an emergency call or when in the pursuit of an actual or suspected violator of the law, or when responding to but not upon returning from a fire alarm, may exercise the privileges set forth in this section, but subject to the conditions herein stated.

"(*b*) The driver of an authorized emergency vehicle may:

"(1) Park or stand, irrespective of the provisions of this article;

"(2) Proceed past a red or stop signal or stop sign, but only after slowing down as may be necessary for safe operation;

"(3) Exceed the maximum speed limits so long as such driver does not endanger life or property;

"(4) Disregard regulations governing direction of movement or turning in specified directions; and

"(5) Proceed through toll booths on roads or bridges without stopping for payment of tolls, but only after slowing down as may be necessary for safe operation and the picking up or returning of toll cards.

"(*c*) The exemptions herein granted to an authorized emergency vehicle shall apply only when such vehicle is making use of an audible signal meeting the requirements of K.S.A. 8-1738 and visual signals meeting the requirements of K.S.A. 8-1720, except that an authorized emergency vehicle operated as a police vehicle need not be equipped with or display a red light visible from in front of the vehicle.

"(*d*) The foregoing provisions shall not relieve the driver of an authorized emergency vehicle from the duty to drive with due regard for the safety of all persons, nor shall such provisions protect the driver from the consequences of reckless disregard for the safety of others."

See also City of Kansas City, Kansas, Code of Ordinances § 36-22 (1964).

In *Thornton v. Shore*, 233 Kan. 737, 666 P.2d 655 (1983), after discussing the purpose and effect of K.S.A. 8-1506, we concluded:

"K.S.A. 8-1506 grants privileges and immunities to the driver of an emergency vehicle while making an emergency run when such driver is operating his vehicle in compliance with the statute." Syl. ¶ 2.

"The duty of a driver upon the immediate approach of an authorized emer-

gency vehicle with activated visual and audible signal devices is to yield the right-of-way by pulling parallel and as close as possible to the right edge or side of the road, clear of any intersection, and remain there until the emergency vehicle has passed." Syl. ¶ 3.

"The required activation of audible and visual signal devices by an authorized emergency vehicle serves a twofold purpose. Such signals: (1) give a safety warning to other users of the roadway; and (2) assist in clearing a path for the emergency vehicle to travel. In the case of a police vehicle attempting to stop a law violator, such signals serve a third purpose—to advise the violator to stop his vehicle." Syl. ¶ 4.

"The driver of an emergency vehicle has a right to assume other drivers will obey the law. He is entitled to rely on this assumption until he has knowledge to the contrary." Syl. ¶ 5.

"The privileges granted by K.S.A. 8-1506 do not relieve the driver of an emergency vehicle from the duty to drive with due regard for the safety of all persons and does not protect the driver from the consequences of reckless disregard for the safety of others (K.S.A. 8-1506[d])." Syl. ¶ 6.

"The test of due regard (due care), as applied to the driver of an emergency vehicle, is whether with the privileges and immunities provided by K.S.A. 8-1506 he acted as a reasonably careful driver." Syl. ¶ 7.

"The duties placed upon the driver of an emergency vehicle by K.S.A. 8-1506(d) relative to driving with due regard for the safety of others applies exclusively to the operation of the emergency vehicle itself." Syl. ¶ 8.

It is undisputed both fire trucks were operating with activated visual and audible signal devices at the time of the collision. The issue of whether the two drivers had operated their vehicles with due regard for the safety of all persons pursuant to K.S.A. 8-1506 was submitted to the jury. The jury concluded each driver was 35 percent at fault. From that verdict we must assume the jury concluded the drivers had not driven with due regard for the safety of all persons and should not be protected "from the consequences of reckless disregard for the safety of others." Is the operation of a vehicle under such circumstances to be considered a "discretionary function or duty" under subsection (d) of K.S.A. 1983 Supp. 75-6104? We think not.

In fact, it would be difficult to visualize a situation where just the actual physical operation of a motor vehicle upon the highway would be a "discretionary function or duty" within the meaning of section (d).

The premier case on 75-6104(d) is *Robertson v. City of Topeka,* 231 Kan. 358, 644 P.2d 458 (1982), wherein this court rejected the planning level-operational level test of the Federal Tort Claims Act discretionary function exception, 28 U.S.C.

§ 2680(*a*), in favor of the nature and quality of the discretion exercised test. In *Robertson,* this court stated:

"[I]t is the nature and quality of the discretion exercised which should be our focus rather than the status of the employee exercising that discretion." 231 Kan. at 362.

In reviewing federal decisions, the *Robertson* court cited *Indian Towing Co. v. United States,* 350 U.S. 61, 100 L.Ed. 48, 76 S.Ct. 122 (1955), wherein it was alleged the U.S. Coast Guard was negligent in the operation of a lighthouse. In *Indian Towing* (in the same vein as *Bowden v. Kansas City,* 69 Kan. 587, 589-90, 77 Pac. 573 [1904]—involving maintenance of a Kansas City fire station), the U.S. Supreme Court held while the Coast Guard may have had discretion in establishing a lighthouse, once it established it, it had a duty to maintain it properly. 350 U.S. at 69. Additionally, the *Robertson* court was impressed with *Downs v. United States,* 522 F.2d 990 (6th Cir. 1975), 36 A.L.R. Fed. 219, wherein plaintiffs were permitted to maintain a negligence action against the U.S. Government because of a botched hijack-thwarting attempt which resulted in the deaths of three people. In *Downs* the U.S. Government had promulgated a handbook which contained procedures for responding to hijackings. As procedures had been established, the government agent had no discretion to proceed with a contrary plan and, therefore, the discretionary function exception was not applicable. In *Downs* the Sixth Circuit Court of Appeals observed:

"We recognize that the agent was called upon to use judgment in dealing with the hijacking. Judgment is exercised in almost every human endeavor. It is not the mere exercise of judgment, however, which immunizes the United States from liability for the torts of its employees. *Driving an automobile was frequently cited in the congressional reports leading to the Act as an example of 'non-discretionary' activity which would be outside the discretionary function exception.*" 522 F.2d at 995. (Emphasis supplied.)

Plaintiffs contend while K.S.A. 1983 Supp. 75-6104(*d*) might have provided defendant City immunity for how and what policies, regulations, and ordinances it may enact in governing its fire department, once such policies, regulations and ordinances were promulgated, the City no longer had discretion on whether to adhere to them. Consequently, if a fire department bulletin said the maximum speed limit of fire department vehicles was 35 m.p.h., the City was negligent and liable if a truck exceeded that limit and, in so doing, injured persons or property.

We must agree that disregard of the requirements of K.S.A. 8-1506 as well as departmental policies and regulations are not within the discretionary function or duty exception of K.S.A. 1983 Supp. 75-6104(*d*). We conclude the district court did not err in holding the defendant City had not met its burden of establishing it and its defendant employees enjoyed immunity for the claims herein under K.S.A. 1983 Supp. 75-6104(*d*).

We turn next to K.S.A. 1983 Supp. 75-6104(*m*) which grants immunity for:

"failure to provide, or the method of providing, police or fire protection."

Defendant City argues K.S.A. 1983 Supp. 75-6104(*m*) grants governmental entities *absolute* immunity from civil actions alleging the government failed to provide fire protection or the method by which the government provided fire protection was negligent. The City asserts that under subsection (*m*) the sole fact the incident herein occurred while two city fire trucks were responding to a fire alarm operates as a complete bar to claimants' actions. In reply, claimants argue subsection (*m*) should not be read so broadly but rather be limited to such situations as how a city fire crew fights a fire or how many fire trucks are dispatched on an alarm. The claimants' construction of K.S.A. 1983 Supp. 75-6104(*m*) appears to be consistent with Kansas and foreign case law.

K.S.A. 1983 Supp. 75-6104(*m*) is identical to a provision in Oklahoma's tort claims act, Okla. Stat. Ann. tit. 51 § 155(6) (West 1983 Supp.). Recently, in *Shockey v. City of Oklahoma City*, 632 P.2d 406 (Okla. 1981), the Oklahoma Supreme Court applied Oklahoma's method of fire protection governmental immunity subsection to a case where homeowners alleged the fire loss of their house had occurred because of the absence of water from the fire hydrant serving their area. Specifically, plaintiffs alleged the city had negligently failed to maintain properly the fire hydrant or to warn plaintiffs of its nonoperational and defective state. Finally, plaintiffs asserted the city had been negligent in failing to provide back-up equipment in case its fire hydrant failed to operate properly. 632 P.2d at 407. In applying Oklahoma's method of fire protection governmental immunity subsection, the Oklahoma Supreme Court initially observed the general rule was the operation and maintenance of a fire department by a municipal corporation was the exercise of a govern-

mental function so as to accord the municipality sovereign immunity from liability when acting in such capacity. Specifically, the court's rationale was:

"Under § 155(6) appellee is exempted from liability for failure to provide, or the method it employs in providing, fire protection. Fire hydrants, as such, are a part of the physical structure of the fire department and their maintenance, including an adequate supply of water, and their repair are incidental to the operation of the fire department. The fire hydrants were installed for the purpose of fire protection. Although appellants' damages may have resulted from a failure of the water service, supplying water to the fire hydrants was just a part of appellee's overall operation in providing fire protection. Assuming, arguendo, appellee negligently failed to employ the proper methods in checking its water service for the proper operation of its fire hydrants, § 155(6) clearly exempts it from liability." 632 P.2d at 408.

Kansas case law before the enactment of the tort claims act is consistent with *Shockey* and suggests how methods of providing fire protection under K.S.A. 1983 Supp. 75-6104(*m*) should be construed. In *Cross v. City of Kansas City*, 230 Kan. 545, 638 P.2d 933 (1982), this court dealt with an appeal from a summary judgment for defendant City of Kansas City. Like in *Shockey*, the plaintiffs in *Cross* alleged the proximate cause of their loss (fire destruction of a lumber yard) was inadequate water supply caused by the negligence of the city in failing to manage, repair, inspect and maintain properly the city water system. 230 Kan. at 546. In *Cross* the former distinction of governmental versus proprietary functions was applicable to determine whether the city was answerable. Quoting from authority, this court declared the prevailing view was a municipality was not liable for failure to supply water for fire protection. 230 Kan. at 548. Similarly, a municipality was not liable for failure to provide adequate fire protection. 230 Kan. at 548. In *Cross* this court held when a city supplied water for fire fighting it was engaged in a governmental capacity and therefore enjoyed governmental immunity. 230 Kan. at 549. See Annot., Liability of Municipality for Damage to Person or Property Due to Hydrant, 113 A.L.R. 661.

In *Rhodes v. City of Kansas City*, 167 Kan. 719, 208 P.2d 275 (1949), plaintiff alleged the city had been negligent in failing to extinguish a fire and by its negligence had created an attractive nuisance whereby a child had been injured. In *Rhodes* an old dug-out basement containing sawdust and debris, collected over years, caught fire. Twice city fire crews were dispatched to

extinguish a fire in the old basement and both times the fire crews failed to extinguish the fire completely—though they believed they had. After the second fire-fighting endeavor plaintiff's child wandered into the basement and was severely burned when his right foot and leg sank down into the debris and into hot burning coals and embers beneath the surface. 167 Kan. at 720. In rejecting plaintiff's claim there was an attractive nuisance litigable against the city, this court commented the city's fault, if any, consisted in the failure to use the requisite care in remedying a condition otherwise created or occurring. Additionally:

"The negligence of the city, if any, was its failure to put out the fire, for which it is not liable. (38 Am. Jur. 327, Municipal Corporations, § 626.)" 167 Kan. at 722-23.

We believe subsection (*m*) is aimed at such basic matters as the type and number of fire trucks and police cars considered necessary for the operation of the respective departments; how many personnel might be required; how many and where police patrol cars are to operate; the placement and supply of fire hydrants; and the selection of equipment options. Accordingly, a city is immunized from such claims as a burglary could have been prevented if additional police cars had been on patrol, or a house could have been saved if more or better fire equipment had been purchased. We do not believe subsection (*m*) is so broad as to immunize a city on every aspect of negligent police and fire department operations. Should firemen negligently go to the wrong house and chop a hole in the roof thereof, we do not believe the city has immunity therefor on the basis the negligent act was a part of the method of fire protection.

We conclude the district court did not err in holding the City had not met its burden of establishing that it and its defendant employees had immunity for the claims herein under subsection (*m*) of K.S.A. 1983 Supp. 75-6104.

Summarizing the entire Kansas Tort Claims Act issue herein, we conclude the district court did not err in holding the defendant City and its defendant employees were not immune from liability on any of the asserted grounds. See generally Note, *Governmental Liability: The Kansas Tort Claims Act [or the King Can Do Wrong]*, 19 Washburn L. J. 260 (1980).

II. DID THE DISTRICT COURT ERR IN ITS INTERPRETATION AND APPLICATION OF THE COM-

MON LAW DEFENSES OF ASSUMPTION OF RISK,
JOINT ENTERPRISE, AND FELLOW SERVANT?

Although previously mentioned, for emphasis, we repeat the fact the claimant firemen herein were not covered by workers' compensation.

For simplicity we shall break this issue down into its component parts and discuss each separately.

(a)   Did the district court err in failing to rule, as a matter of law, the firemen, by their employment, had assumed the risk of being injured while riding upon the fire trucks?

In *Blackmore v. Auer*, 187 Kan. 434, 357 P.2d 765 (1960), this court provided an extensive commentary on assumption of risk in Kansas which included the following:

"Assumption of risk, in the law of master and servant, is a phrase commonly used to describe a term or condition in the contract .of employment, either express or implied from the circumstances of the employment, by which the employee or servant agrees that certain dangers of injury, while he is engaged in the service for which he is hired, shall be at the risk of the employee or servant. (56 C.J.S., Master and Servant, § 357, pp. 1148, 1149.)

"In *Railway Co. v. Bancord*, 66 Kan. 81, 71 Pac. 253, it was said:

" '.   .   .   But, reduced to its last analysis, the doctrine of assumed risk must rest for its support upon the express or implied agreement of the employee that, knowing the danger to which he is exposed, he agrees to assume all responsibility for resulting injury. To raise an implied agreement the risk assumed must be known to the employee, or it must be of such nature as, by the exercise of reasonable observation and caution for his own safety, he should have known it. It can never be said that one has agreed to assume responsibility for that of which he had no knowledge, or of the existence of which he is not chargeable with notice.' (p. 88.)

"The foregoing language was quoted with approval and applied in *Parker v. City of Wichita*, 150 Kan. 249, 92 P.2d 86. It was also quoted in *Taylor v. Hostetler*, 186 Kan. 788, 352 P.2d 1042.

"It has been said that one who, knowing all the danger and peril of pursuing a given course and being under no compulsion to encounter the same, freely and voluntarily continues therein, cannot recover damages for injuries he may suffer. (*Sweet v. Railroad Co.*, 65 Kan. 812, 70 Pac. 883; and *Cooper v. Southwestern Bell Telephone Co.*, 159 Kan. 67, 151 P.2d 692.)" 187 Kan. at 444.

Defendant City contends all four claimant firemen assumed the risk they could be injured in a traffic accident as an incident of their employment. Specifically, the City argues it was an ordinary and incidental part of a firefighter's employment that in the course of duty he would be transported from a fire station to the location of a fire. Further, it was an ordinary and incidental part of that employment the transportation would be by an

emergency vehicle. Finally, "[t]he risk of an accident or a collision is one assumed by every driver and every passenger of a motor vehicle, including an emergency vehicle."

In *Borth v. Borth*, 221 Kan. 494, 561 P.2d 408 (1977), this court quoted from *Blackmore v. Auer*, 187 Kan. 434, in declaring:

" 'The assumption of the usual risks of an employment is not ordinarily a jury question. It is a matter of law. It is only where the risk is or may be unusual that a jury question can arise; and even in such cases, if the risk though unusual is obvious, such as an ordinarily prudent man could appreciate and understand, the workman who persists in the employment assumes the risk of it. *Lively v. Railway Co.*, 115 Kan. 784, 225 Pac. 103, and authorities cited therein.' (pp. 444, 445.)" 221 Kan. at 501.

In *Miller v. Beech Aircraft Corporation*, 204 Kan. 184, 460 P.2d 535 (1969), this court noted the doctrine was not viable where the risks resulted from the master's negligence. 204 Kan. at 190.

The trial court refused to rule, as a matter of law, the risk of collision between the two fire trucks was a risk assumed by the claimant firemen in their employment. The City contends this was error. We do not agree. The firemen herein contended the City itself was negligent in a number of respects. In fact, the following special questions and answers were part of the verdict:

"5. Do you find that at the time and place in question the City of Kansas City, Kansas exposed its firemen in the discharge of their duties to perils and dangers which the city could have guarded against by the exercise of reasonable care?

Yes
_____
(Yes or No)

. . . .

"7. Do you find that any of the following firemen assumed any inherent risks of employment, which were known to or which by the exercise of reasonable care should have been known to the firemen, at the time and place in question, against which the city could not have guarded by the exercise of reasonable care?

David Jackson      No
_____
(Yes or No)

Kermit Kitchen      No
_____
(Yes or No)

Dan Freeman      No
_____
(Yes or No)

Thomas DeKeyser      No
_____
(Yes or No)

"8. At the time and place in question, do you find that any of the following

firemen assumed an unusual but obvious risk which an ordinary prudent man could appreciate and understand?

| David Jackson | No |
| --- | --- |
| | (Yes or No) |
| Kermit Kitchen | No |
| | (Yes or No) |
| Dan Freeman | No |
| | (Yes or No) |
| Thomas DeKeyser | No |
| | (Yes or No)" |

A collision between two fire trucks on emergency runs is, fortunately, a rare occurrence. We do not believe such a collision could be considered, as a matter of law, a usual risk of a fireman's employment. See generally Annot., Liability for Personal Injury or Damage from Operation of Fire Department Vehicle, 82 A.L.R.2d 312. Additionally, serious allegations were being made (and later established to the jury's satisfaction) of the City's own negligence. We conclude the trial court did not err in refusing to rule, as a matter of law, the firemen had assumed the risk herein involved.

> (b) Did the district court err in failing to rule, as a matter of law, plaintiffs Jackson and Kitchen were engaged in a joint enterprise when they rode in the No. 5 fire truck on September 10, 1979?

In *Scott v. McGaugh,* 211 Kan. 323, 506 P.2d 1155 (1973), this court was confronted by a case in which plaintiff, Mr. Scott, was riding in an automobile driven by one Mr. McClure, at the time of an intersection collision with a vehicle operated by defendant McGaugh. At trial Mr. McGaugh contended Messrs. Scott and McClure were engaged in a joint enterprise at the time of the accident and consequently, the negligence of Mr. McClure was imputable to Mr. Scott and precluded him from recovering from the defendant. The trial court agreed with defendant McGaugh and ruled, as a matter of law, Messrs. Scott and McClure were engaged in a joint enterprise. After making its ruling of law the trial court instructed the jury any negligence of Mr. McClure should be imputed to plaintiff Scott.

Messrs. Scott and McClure had been employed by the same insurance company as trainee salesmen. The company en-

couraged its employees to work in pairs. Occasionally, before the accident, Messrs. Scott and McClure had worked together. Sometimes they had driven Mr. Scott's car, while at other times Mr. McClure's vehicle was used. One day both Mr. Scott and Mr. McClure had appeared at the company's office to collect a list of prospective customers. At that time they decided to join forces for the day and approach customers together. For no other reason than Mr. McClure's automobile was closer, Messrs. Scott and McClure entered the latter's car and embarked on their work. While driving to a customer's residence, they were involved in a collision with Mr. McGaugh.

In *Scott* this court observed joint enterprise, or joint adventure, came within the imputed negligence concept of tort law. 211 Kan. at 326. While, as a general proposition imputed negligence would bar a plaintiff's recovery, this court also commented the legal fiction which had given rise to imputable negligence had been criticized and had found small favor with the courts. 211 Kan. at 327. In Kansas, the court declared, joint enterprise liability must arise by reason of a contract, agreement or understanding between the parties and such agreement or understanding could be either expressed or implied. 211 Kan. at 327. Following earlier authority the court enunciated the necessary elements of joint enterprise. First, there must be an agreement; second, a common purpose; third, a community of interest; and, fourth, an equal right to a voice, accompanied by an equal right of control over the instrumentality. 211 Kan. at 327. Concerning the right to control, the court said it was an essential element which must be present by agreement if vicarious liability were to be imposed upon a passenger under a theory of agency between joint adventurers. 211 Kan. at 328. Where no express agreement for mutual right of control was present, an agreement could be implied if the facts and circumstances would support such an understanding. 211 Kan. at 328.

In *Scott* the court reviewed a number of cases where joint enterprise had been alleged but not found. The court then summarized.

"We have been unable to find a case with a factual situation identical to our present case. *It is noteworthy that in our research we have failed to find any alleged joint enterprise case in which this court has held a trial court was justified under the evidence in imposing vicarious liability upon the passenger as a matter of law.* In the future there may arise such a case but instances, no

doubt, will be rare in the absence of an express agreement for mutual 'right of control'." 211 Kan. at 329. (Emphasis supplied.)

The court then commented in several prior cases it had held the right to control was a jury question. 211 Kan. at 329. One of these was *Kelty v. Best Cabs, Inc.*, 206 Kan. 654, 481 P.2d 980 (1971), cited as an example of a situation where the facts of a joint enterprise were compelling, but the issue of whether such an enterprise existed was for the jury. In *Kelty* the driver and passenger, husband and wife, worked together in a paperhanging business. The accounts and records of the business were jointly kept. The income from their mutual efforts went into a joint account and joint income tax returns were filed. Additionally, the truck they were riding in at the time of the collision was jointly titled in both their names. Even in this strong factual situation this court ruled joint enterprise had not been established as a matter of law. 206 Kan. at 660.

Speaking of the driver and passenger in *Scott* this court observed any common purpose or community of interest between them was entirely dependent upon their employment and that, further, their community of interest did not exist separate and apart from their employment. 211 Kan. at 330.

The court in *Scott* also observed:

"Although a plaintiff passenger and a driver of an automobile are co-workers or fellow employees of a common employer and both are acting in the course of and in the furtherance of the business this alone does not make them participants in a joint enterprise which will impose vicarious liability under the 'right of control' test; and this is true irrespective of whether the vehicle is owned by the employer, the fellow driver or by the plaintiff himself." 211 Kan. at 330.

See also Restatement (Second) of Torts § 491, comment *f* (1965).

In *Spellman v. Street Railway Co.*, 87 Kan. 415, 124 Pac. 363 (1912) (also arising from Kansas City), this court dealt with an action where plaintiffs, a driver and his captain who were riding upon a horse-drawn fire vehicle responding to an alarm, were involved in a collision with a street rail car. In defense the railway company suggested the alleged negligence of the driver should be imputed to his superior officer, the captain. 87 Kan. at 417. In rejecting this contention and affirming judgment for plaintiffs, this court said:

"[T]he testimony shows that the captain could not control and did not attempt to control the action of the driver who had the one present imperative duty to

perform of so handling his team as to reach the scene of the supposed fire. *Even had the testimony shown the driver to have been negligent, such negligence would not necessarily have been imputable to the plaintiff.*" 87 Kan. at 417. (Emphasis supplied.)

We conclude the district court did not err in refusing to rule that, as a matter of law, Kitchen and Jackson were engaged in a joint enterprise.

(c) Was the district court's instruction on joint enterprise erroneous?

In Instruction No. 18 the district court charged the jury on the defendant City's theory plaintiffs Jackson and Kitchen were engaged in a joint enterprise at the time of the collision and the negligence of plaintiff Jackson, if any, was chargeable to plaintiff Kitchen. Instruction No. 18 stated:

"Inasmuch as the defendant city has claimed the defense of joint enterprise in this case, you must decide if plaintiff Kermit Kitchen is chargeable with the negligence, if any, of plaintiff David Jackson.

"Plaintiff Kitchen is chargeable with any negligence of Jackson if you find that Jackson and Kitchen were operating the vehicle as a joint enterprise.

"To constitute a joint enterprise which will impose vicarious liability the following four elements must be established before the relationship of the parties will give rise to an application of imputed negligence: There must be

"(a) An agreement, express or implied, between the driver and passenger;

"(b) A common purpose;

"(c) A community of pecuniary interest in that purpose;

"(d) An equal right to a voice, accompanied by an equal right of control over the vehicle."

Defendant City's requested instruction was modeled on PIK Civ. 2d 8.92, 8.93 and stated:

"If David Jackson and Thomas DeKeyser were each negligent and the negligence of each contributed to the injury to the plaintiff, Kermit Kitchen, then you must decide whether plaintiff Kitchen, is chargeable with the negligence of David Jackson.

"Plaintiff Kitchen is chargeable with the negligence of David Jackson, if you find that Jackson and Kitchen were operating the vehicle as a joint enterprise.

"A joint enterprise between a passenger and a driver occurs where there is a common purpose for which they jointly use and occupy the vehicle so as to give each the equal privilege and right to control and manage its operation. *The meaning of the [word] 'control' is not necessarily limited to participation in the manual operation of the vehicle; it also includes any situation where there is an understanding between the parties that the passenger has the right, and is possessed of equal authority with the driver, to prescribe conditions of use and operation of the vehicle.*" (Emphasis supplied.)

Defendant City contends the failure of the district court to give the City's joint enterprise instruction, particularly as to the meaning of the word "control" (emphasized above), constitutes reversible error.

The four elements necessary to sustain a defense of joint enterprise set forth in Instruction No. 18 were taken almost verbatim from *Scott v. McGaugh*, 211 Kan. at 327. Additionally, the comment following PIK Civ. 2d 8.93, which defendant City relied upon for its proposed joint enterprise instruction, discussed *Scott* and also listed the four elements set forth in that opinion.

We conclude Instruction No. 18 adequately stated the applicable law and cannot, therefore, be the basis for a claim of reversible error.

    (d)   Did the district court err in failing to rule, as a matter of law, the firemens' actions were barred by the fellow servant doctrine?

Defendant City contends the fellow servant doctrine barred these actions by the firemen and the district court erred in not finding as a matter of law the firemens' claims were barred by the doctrine.

The rule an employer is not liable for injuries caused solely by the negligence of a fellow servant first appeared in England in *Priestly v. Fowler*, 3 M. & W. 1, 150 Eng. Rep. 1030 (1837). The doctrine rapidly found favor in America. *Farwell v. Boston and Worcester Rail Road Corporation*, 45 Mass. (4 Met.) 49 (1842). Prosser, Law of Torts § 80 (4th ed. 1971), has commented:

"Although [fellow servant] has been assailed as a direct departure from the established rule of vicarious liability for the torts of servants within the scope of their employment, it probably should be regarded as an inherent limitation upon that rule itself, which seems to have been conceived as an obligation of the head of the household to those who were not his servants. The reasons usually assigned for it, however, were that the plaintiff upon entering the employment assumed the risk of negligence on the part of his fellow servants, and the master did not undertake to protect him against it; that he was as likely to know of their deficiencies and to be in a position to guard against them as his employer; and that it would promote the safety of the public and of all servants to make each one watchful of the conduct of others for his own protection." pp. 528-29.

According to Prosser after the general rule was declared a number of restrictions were developed when the harshness of the rule imposed upon labor became apparent. Prosser, Law of

Torts § 80, p. 529. One commentator on the fellow servant rule has observed it is a creature of common law and has characterized it as one of the "unholy trinity of common law defenses," the other two being contributory negligence and assumption of risk. Comment, *Torts—Fellow Servant Rule,* 9 Washburn L. J. 488 (1970). The same commentator has continued:

"The Kansas fellow servant rule was well stated in the recent case of *Hacker v. Brookover Feed Yard, Inc.* [, 202 Kan. 582, 451 P.2d 506 (1969)]:

" 'The essence of the fellow-servant rule is that, ordinarily, an employer is not liable to an employee for injuries due solely to negligence on the part of his co-employees who are engaged with him in the common work of their common employer.'

Therefore, before the fellow servant rule may be utilized, two prerequisites have to be met: First, the employees must be employed by a common employer; secondly, the injury must be caused by the negligence of a coemployee." 9 Washburn L. J. at 488-89.

Further:

"The basic justification for this rule is that through the contract of employment, an employee has assumed all the risks incident to his employment, and should foresee that the negligence of his coemployees might result in injury to him. However, before the employee assumes the risks of his employment as a matter of law, a duty rests upon the employer not to expose his employees to risks which the employee cannot reasonably guard against. Therefore, the employer is obligated to provide his employees with a safe place to work, suitable machines and tools, reasonably safe materials, and suitable coemployees. Also, the duty to warn of hazardous conditions which an employee may encounter within the scope of his employment is placed upon the employer. It is not until after the employer has discharged all of his duties does the law place upon the employee the assumption of risks incident to the performance of his employment, including the risks from the possible negligence of his fellow servants. The employee is entitled to assume that his employer has properly performed his duties upon entering employment.

"Since the common law has placed specific duties upon the employer, he cannot escape liability by delegation of those duties to an employee. If the employee is negligent in the performance of these duties, the employer will be held liable to the same extent as though he himself had been guilty of the negligence." 9 Washburn L. J. at 489-90.

PIK Civ. 2d 7.25-7.27.

In *Roda v. Williams,* 195 Kan. 507, 407 P.2d 471 (1965), this Court observed at common law fellow employees mutually owed to each other the duty of exercising ordinary care and each was liable for a failure in that respect which resulted in injury to a fellow employee. 195 Kan. 507, Syl. ¶ 1. In *Schwarzchild v. Weeks,* 72 Kan. 190, 83 Pac. 406 (1905), the court declared in

order for a master to claim exemption from liability for injuries to a servant, the master must have exercised reasonable care to prevent the injury. Further, the risk the master may neglect to do this is not one the servant assumes. 72 Kan. at 195.

This is not the first time the City of Kansas City has asked this court to hold a lower court erred in not determining firemen riding together on a fire department vehicle in response to a fire alarm were fellow servants. In *Kansas City v. McDonald,* 60 Kan. 481, 57 Pac. 123 (1899), this court held the city's claim a fireman's death was caused by the negligence of a fellow servant in the operation of a fire department vehicle was untenable. 60 Kan. at 488. Succinctly this court announced the firemen had not been fellow servants. 60 Kan. at 488. Additionally, the court found no error in the trial court declining to charge the jury with defendant city's requested fellow servant instruction, holding:

"We have examined the instructions tendered by the city and refused by the court, and see no error in their refusal. The court instructed that McDonald was not in any manner responsible for any negligence of Clarke, the captain of the truck. *They were not fellow-servants.* (1 Beach, Pub. Corp., §§ 741-744; 2 Dillon, Mun. Corp. 977-980; *Lawson v. Seattle,* 6 Wash. 184, 33 Pac. 347; *Peters v. City of Lindsborg,* 40 Kan. 654, 20 Pac. 490.)" 60 Kan. at 488. (Emphasis supplied.)

See also Restatement (Second) of Torts § 491, comment *f* (1965); and *Scott v. McGaugh,* 211 Kan. at 330.

We conclude the district court did not err in failing to hold, as a matter of law, any of the firemen were fellow servants. Additionally, the lower court committed no error in failing to charge the jury upon the fellow servant doctrine.

    (e) Has the adoption of comparative fault (K.S.A. 60-258a) abolished the common law defense of assumption of risk?

The defendant City contends the claims against it by the firemen are barred by the common law defense of assumption of risk. The firemen contend the adoption of comparative fault has abolished this common law defense.

The status of the defense of assumption of risk after introduction of comparative fault has presented a thorny problem for a number of jurisdictions. A good summary of the case law in this area is set forth at Annot., Effect of Adoption of Comparative Negligence Rules on Assumption of Risk, 16 A.L.R. 4th 700. In this annotation states are categorized by the result reached on this issue. One commentator in the field has categorized states, at least in part, on a statutory basis, *i.e.* whether comparative

negligence was judicially or statutorily imposed, whether assumption of risk was statutorily or judicially merged or abolished, etc. Woods, The Negligence Case: Comparative Fault §§ 6:1-6:11, pp. 111-58 (1978).

A review of the case law in the area reveals that, in the absence of express statutory direction as to the status of assumption of risk after the introduction of comparative negligence, judicial determination of the issue is heavily influenced by how the defense of assumption of risk was construed and applied prior to the introduction of comparative negligence in the particular jurisdiction. A review of Kansas case law relative to assumption of risk before the 1974 introduction of comparative fault (K.S.A. 60-258a) is appropriate.

*Borth v. Borth,* 221 Kan. 494, 561 P.2d 408 (1977), contains a good summary of Kansas law on assumption of risk. Although decided after the introduction of comparative fault (1974), the cause of action arose prior thereto (1971). This court stated:

"The doctrine of assumption of risk is still viable in Kansas though its application is limited to cases such as this where a master-servant relationship is involved. *Smith v. Blakey, Administrator,* 213 Kan. 91, 101, 515 P.2d 1062. We turn first to our recent decisions in master-servant cases involving the doctrine. *Mechtley v. Price,* 217 Kan. 344, 536 P.2d 1385, was an action by a farm employee against his employers to recover for personal injuries when an unshod horse he was riding stumbled and fell. We there said:

"'. . . Assumption of risk, in the law of master and servant, is a phrase commonly used to describe a term or condition in the contract of employment, either express or implied from the circumstances of the employment, by which the employee agrees that certain dangers of injury, while he is engaged in the service for which he is hired, shall be at the risk of the employee (*Blackmore v. Auer,* 187 Kan. 434, 357 P.2d 765). Assumption of risk generally bars recovery by an employee who knows of the danger in a situation but nevertheless voluntarily exposes himself to that danger. In *Kleppe v. Prawl,* 181 Kan. 590, 313 P.2d 227, 63 A.L.R.2d 175, we said:

"'". . . [A]ssumption of risk arises through implied contract of assuming the risk of a known danger; the essence of it is ventureousness; it implies intentional exposure to a known danger; it embraces a mental state of willingness; it pertains to the preliminary conduct of getting into a dangerous employment or relation; it means voluntarily incurring the risk of an accident, which may not occur, and which the person assuming the risk may be careful to avoid; it defeats recovery because it is a previous abandonment of the right to complain if an accident occurs." (p. 594.)

"'It should be noted the knowledge and appreciation of the risk involved is to be judged by a subjective standard, by knowledge attributable to the individual plaintiff and his situation (Prosser, Law of Torts, 4th ed., 1971, § 68, p. 447).' (p. 348.)

"However, we should note that Prosser goes on to say that:

" '. . . [A] purely subjective standard opens a very wide door for the plaintiff who is willing to testify that he did not know or understand the risk; and there have been a good many cases in which the courts have said in effect that he is not to be believed, so that in effect something of an objective element enters the case, and the standard applied in fact does not differ greatly from that of the reasonable man. The plaintiff will not be heard to say that he did not comprehend a risk which must have been quite clear and obvious to him. . . .' Prosser, Law of Torts, 4th ed., 1971, § 68, p. 448.

"*Uhlrig v. Shortt,* 194 Kan. 68, 397 P.2d 321, was an action by a farm hand against his employer to recover damages for the loss of an eye. The injury occurred while the parties were filling a silo. We said:

" '. . . The employer is not to be held liable for an injury to an employee simply because of danger which was inherent in the employment, whether in the place of employment or the cause of the danger inherent in the tools, machinery or appliances with which the work must be performed. A master is not an insurer against injuries which his servants may incur in the discharge of their duties. . . .

" 'There can be no liability on the part of the employer where it appears that the employee's knowledge of the danger was equal to or surpassed that of the employer. . . .

" 'Generally an employer will not be held liable if he . . . conducts his business in a manner conforming to the usage of others engaged in the same business under similar circumstances. See, *e.g.,* . . . *Blackmore v. Auer,* 187 Kan. 434, 442, 357 P.2d 765.

. . . .

" 'Many of the rules just announced are no doubt a result of the application of the doctrine of assumption of risk. In 35 Am. Jur., Master and Servant, § 299, pp. 722, 723, in considering the risk assumed, the rule is stated thus:

" ' "The injuries for which an employee is barred from recovery by virtue of the doctrine of assumption of risk include but, according to the general accepted statement, do not extend beyond those which result from the 'ordinary' risks of the employment or such as are 'incident' thereto. An assumption of risk merely by virtue of the contract of employment embraces such perils, hazards, and dangers as are ordinarily and normally incident to or a part of the employment in question and of which the employee has knowledge, actual or implied, or of which it may be said that he is presumed to know. Under the head of 'ordinary risks' are classed all those dangers or perils ordinarily incident to the conduct of the particular business in which the employee engages—those which exist after the employer has done everything that he is bound to do for the purpose of securing the safety of his employees. The term includes not merely those dangers which are obvious and open, but also those risks which, while not visible, are nevertheless a natural incident of the employment. The employee does not, however, merely by accepting employment, assume the risks which are not usually and ordinarily incident to that employment. As thus restricted, the doctrine rests on the thought that the employee, upon entering the employment of the master, assumes all the risks that are ordinarily and usually incident to the service upon which he enters, and if he is injured solely by reason of these perils he is not entitled to recover. . . . ." ' "

" 'The doctrine of assumption of risk rests for its support upon the express or implied agreement of the employee that, knowing the danger to which he is exposed, he agrees to assume all responsibility for injuries resulting from his employment. This court has stated that to raise an implied agreement the risk assumed *must be known to the employee, or it must be of such a nature as, by the exercise of reasonable observation and caution for his own safety, he should have known it.* One, knowing all the danger and peril of pursuing a given course and being under no compulsion to encounter the same, who freely and voluntarily continues therein, cannot recover damages for injuries he may suffer. . . .' " (pp. 71-73.)

"In *Blackmore v. Auer,* 187 Kan. 434, 357 P.2d 765, where a farm laborer was injured while loading baled hay, we said:

" 'The assumption of the usual risks of an employment is not ordinarily a jury question. It is a matter of law. It is only where the risk is or may be unusual that a jury question can arise; and even in such cases, if the risk though unusual is obvious, such as an ordinarily prudent man could appreciate and understand, the workman who persists in the employment assumes the risk of it. *Lively v. Railway Co.,* 115 Kan. 784, 225 Pac. 103, and authorities cited therein.' (pp. 444, 445.)" 221 Kan. at 499-501.

In discussing the common law defense of fellow servant, which is a subspecie of assumption of risk, this court in *Taylor v. Hostetler,* 186 Kan. 788, 352 P.2d 1042 (1960), stated:

"For the master to claim exemption from liabilities for injuries to a servant on the ground that the negligent act was that of a fellow servant, the master must have exercised reasonable care to prevent the injury. The risk that the master may be negligent in performing his duty is not one that the servant assumes.

"A duty rests upon the master not to expose the servant, in the discharge of his duty, to perils and dangers against which the master may guard by the exercise of reasonable care. These duties are: (1) To provide safe and suitable machinery and appliances for the business, including a safe place to work. This includes the *exercise of reasonable care in furnishing such appliances, and the exercise of like care in keeping the same in repair and in making proper inspections and tests.* (2) To exercise like care in providing and retaining sufficient and suitable servants for the business, and instructing those who, from newness or age, evidently need it. (3) To establish proper rules and regulations for the service, and, having adopted such, to conform to them. (*Schwarzschild v. Weeks,* 72 Kan. 190, 83 Pac. 406.)

"The rule, on the assumption of risk under the fellow-servant doctrine, quoted in *Bridge Co. v. Miller,* [71 Kan. 13, 80 Pac. 18 (1905)], was stated by Mr. Justice Valentine in *A. T. & S. F. Rld. Co. v. Moore,* 29 Kan. 632, in the following luminous way:

" '. . . In all cases, at common law, a master assumes the duty toward his servant of exercising reasonable care and diligence to provide the servant with a reasonably safe place at which to work, with reasonably safe machinery, tools and implements to work with, with reasonably safe materials to work upon, and with suitable and competent fellow-servants to work with him; and when the master

has properly discharged these duties, then, at common law, the servant assumes all the risks and hazards incident to or attendant upon the exercise of the particular employment or the performance of the particular work, including those risks and hazards resulting from the possible negligence and carelessness of his fellow-servants and coemploye's . . .' (p. 644.)"

"Upon the authorities in this jurisdiction the servant, in the contract of employment, assumes all the ordinary risks of the employment. In the exercise of ordinary care he must foresee that the negligence of those with whom he works may result in injury to him. Danger from that source is one of the ordinary incidents of the service, and so far as it fairly may be anticipated it is assumed. (*Bridge Co. v. Miller*, supra, and authorities cited therein.)

"In an action by a servant against the master for negligence, where the negligent act is in violation of a positive duty which the master owes to the servant, that becomes the controlling fact in determining the master's liability; and where the negligence of the master is the proximate cause of the injury the master will be held liable, notwithstanding the negligence of the master may have been set in operation by the act of one who otherwise might be held to be a fellow servant. In such situation the fellow-servant doctrine is not involved. (*Schwarzschild v. Weeks*, supra.)" 186 Kan. at 796-97.

PIK Civ. 2d 7.20, 7.21, 7.22 and 7.23 state the jury instructions applicable to assumption of risk.

It should be emphasized, in Kansas the defense of assumption of risk is limited to cases involving the master-servant relationship (*Borth v. Borth*, 221 Kan. at 499; *Smith v. Blakey, Administrator*, 213 Kan. 91, 101, 515 P.2d 1062 [1973]). Further, the defense of assumption of risk is not available where the injury received is subject to the Workmen's Compensation Act. See K.S.A. 44-545. As shown by the cases heretofore cited the employer must, in essence, be negligence free as a condition to the successful assertion of the defense of assumption of risk. Therefore, when assumption of risk has been established there is no negligence to be compared between the employer and the injured employee.

In *George v. Beggs*, 1 Kan. App. 2d 356, 564 P.2d 593, *rev. denied* 225 Kan. 844 (1977), the Court of Appeals held assumption of risk constituted a total bar to recovery even after the enactment of K.S.A. 60-258a. In so holding the court stated:

"Plaintiff also argues that, because of the comparative negligence statute, assumption of risk should no longer be considered a complete bar to recovery. He suggests that assumption of risk is an outmoded and unfair doctrine, especially so when contributory negligence is no longer an absolute bar to recovery.

"The doctrine of assumption of risk was considered and applied by our supreme court as recently as March 5, 1977, in the case of *Borth v. Borth*, 221 Kan. 494, 561 P.2d 408, wherein it was stated:

" 'The doctrine of assumption of risk is still viable in Kansas though its application is limited to cases such as this where a master-servant relationship is involved. . . .' (p. 499.)

We note that the *Borth* case dealt with the circumstances of an accident which occurred in 1971, prior to the enactment of our comparative negligence statute, K.S.A. 60-258a, which provides that the contributory negligence of a party in a civil action is not a complete bar to recovery for damages for negligence resulting in personal injuries. However, our court has consistently drawn a distinction between the doctrine of assumption of risk and contributory negligence, the latter not necessarily being an element in injuries sustained in employment where the assumption of risk doctrine is applicable. (See *Kleppe v. Prawl,* 181 Kan. 590, 313 P.2d 227; *Smith v. Blakey, Administrator,* 213 Kan. 91, 515 P.2d 1062.) *Assumption of risk and contributory negligence being separate and distinct concepts in this state, the former remains a complete bar to recovery in cases such as here involved.*" 1 Kan. App. 2d at 358-59. (Emphasis supplied.)

The result reached by the Court of Appeals in *George* is buttressed by K.S.A. 60-208(*c*) relative to pleading affirmative defenses. The statute provides:

"*Affirmative defenses.* In pleading to a preceding pleading a party shall set forth affirmative accord and satisfaction, arbitration and award, *assumption of risk,* contributory negligence, discharge in bankruptcy, duress, estoppel, failure of consideration, fraud, illegality, *injury by fellow servant,* laches, license, payment, release, res judicata, statute of frauds, statute of limitations, waiver, and any other matter constituting an avoidance or affirmative defense. When a party has mistakenly designated a defense as a counterclaim or a counterclaim as a defense, the court on terms, if justice so requires, shall treat the pleading as if there had been a proper designation."

In 1976, two years after the adoption of comparative negligence (1974), the Kansas Legislature amended K.S.A. 60-208(*c*) to add res judicata as an affirmative defense. The statute was thus brought to the legislature's attention in 1976 but neither assumption of risk nor fellow servant was deleted therefrom. If the legislature had intended the defenses be abolished by the adoption of comparative fault, it clearly had the opportunity in 1976 to do so statutorily.

We conclude, that in its very restricted periphery of application, the common law defense of assumption of risk remains viable and continues to constitute an absolute bar to recovery by an injured employee.

III. DID THE DISTRICT COURT ERR IN FAILING TO SUBMIT PLAINTIFF DAN FREEMAN'S NAME TO THE JURY FOR PURPOSES OF COMPARATIVE FAULT DETERMINATION?

At the time of the collision, Fireman Dan Freeman was riding on the rear platform of No. 5 fire truck. The vehicle was being driven by David Jackson. Also on board was Acting Captain Kermit Kitchen. The force of the impact hurled Fireman Freeman approximately 80 feet from the vehicle and he received severe injuries as a result thereof. Fireman Freeman was a passenger on the No. 5 truck with no control over its operation.

Apparently Fireman Freeman had the option under the applicable departmental regulations to ride either on the platform or in a jump seat behind the driver's cab. The City contends the election of Fireman Freeman to ride on the platform contributed to his injuries and that the issue of his comparative fault should have been submitted to the jury. In support of this proposition the City states:

"[T]he Court . . . precluded the City from putting before the jury its evidence that Exhibit No. 69, which was Department bulletin 627, relating to the option of firefighters to ride on jump seat as opposed to the rear end of the rig, was adopted as a safety measure at the request of the firefighters' union . . . . The City suggests that such evidence was relevant to the issue of whether Freeman, who opted to ride on the rear, bore some fault for the extent of his injuries."

The City, however, has not seen fit to include Exhibit No. 69 in the record on appeal and we, therefore, cannot consider the same. As noted in *State v. Bright,* 229 Kan. 185, 623 P.2d 917 (1981):

"An appellant has the burden of furnishing a record which affirmatively shows that prejudicial error occurred in the trial court. In the absence of such a record, we presume that the action of the trial court was proper." Syl. ¶ 6.

There is no showing Fireman Freeman violated departmental regulations in riding on the platform rather than in the jump seat. We conclude the trial court did not err in refusing to submit Fireman Freeman's name to the jury for purposes of comparing fault.

## IV. WERE THE DAMAGE AWARDS EXCESSIVE?

Liability issues were determined by the jury while the amount of damages the respective litigants were entitled to was determined in a subsequent bench trial. The trial court held, by virtue of K.S.A. 1979 Supp. 75-6105, the maximum liability for the aggregate of all claims herein was $500,000.00 and that, should such amount be exceeded, apportionment of awards would be necessary.

In the damage determination phase of this case the trial judge ruled the following awards should be made:

| | | |
|---|---|---|
| 1. | David Jackson | $ 87,750.00 |
| 2. | Thomas DeKeyser | $ 1,500.00 |
| 3. | Kermit Kitchen | $119,750.00 |
| 4. | Daniel Freeman | $203,750.00 |
| 5. | Edgar & Nellie Glover | $ 79,750.00 |
| 6. | Earl & Elizabeth McCord | $ 7,500.00 |
| | Total: | $500,000.00 |

On appeal defendant City contends the awards as to Messers. Jackson, Freeman and Kitchen were excessive.

As a result of injuries sustained in the collision, David Jackson's left leg was amputated above the knee. He continues to have pain and numbness in various parts of his body. The prosthesis he wears creates a number of recurring physical problems. At the time of the accident, Mr. Jackson had a 36.2 year life expectancy.

Daniel Freeman was thrown from the fire truck with great force and his head struck a brick wall. He suffered an epidural hematoma which stripped the dura, the covering of the brain, away from the bone. He had to undergo brain surgery. Additionally, he suffered a fractured shoulder blade and multiple fractured ribs. He was hospitalized from September 10, 1979, until March 7, 1980, and has suffered considerable permanent brain damage.

Kermit Kitchen sustained a closed head injury with bruising to the right frontal brain lobe, bilateral basal skull fractures, multiple rib fractures, pneumohemothorax, multiple fractures of a wrist, and numerous abrasions. While disputed, there was substantial evidence introduced of permanent brain damage resulting from Mr. Kitchen's injuries. The trial court found Mr. Kitchen had suffered permanent brain damage.

The City's primary complaint about the size of the awards is stated in its brief as follows:

"The City suggests that the award of monetary damages to the employee-claimants in this case is excessive. The Court awarded damages for physical injury without consideration of loss of salary or medical expenses . . . which were partially satisfied by the medical insurance, injury leave and pension provided by the city, as well as by payments provided by the Firemen's Relief Association. As pointed out earlier in this brief, these payments

were all to which the employee plaintiffs were entitled by virtue of contractual agreements between the City and the IAFF [International Association of Fire Fighters] and between the City and the Firemen's Relief Association."

In disposing of this issue, the trial court stated:

"One is the City's defense of what the plaintiffs would like to call collateral source. None of the parties have briefed this question for me. I don't know if the pension payments given to the firemen are—fall under the collateral source rule or if these are matters of contribution which the City is paying the plaintiffs because of the injuries received by them. The same would be true of the medical payments which all of the plaintiffs have received which have substantially satisfied their past medical expenses, and I understand at least $150 of the pension benefits that they are receiving, that being the benefits that they are receiving directly from the Firemen's Relief Fund, is primarily to be used for future medical expenses.

"Apparently the premiums paid for the insurance coverage were paid by the City solely rather than by either the plaintiffs or any third source. I've heard really no evidence—all I've heard is a statement by Mr. Denk [counsel for the City], but really no evidence as to whether these benefits were derived from any type of collective bargaining agreement or if they were payments which were voluntarily made by the City.

"However, I find in this case it is immaterial as to whether these payments were voluntarily made by the City or do in fact fall under the collateral source rule. The evidence clearly demonstrates in this case that, with the exception of Mr. DeKeyser, all of the plaintiffs were severely and permanently injured as a result of the accident in question.

. . . .

"I have, in considering all of the damages suffered, the personal injuries suffered by the plaintiffs along with the property damage sustained in this case, I feel that the total damages would have—and this again does not consider the extensive loss of wage or medical expenses, would have approximated the sum of one million dollars.

"If I considered all the probable future loss of wage of all of these plaintiffs, I think the probable verdict in this case, if there had not been the statutory limitation, would have exceeded three to four million dollars."

We agree with the trial court. Even excluding expenses paid by the City-purchased insurance, the City's wage payments, and contribution to the pensions, we conclude the apportioned verdicts are clearly not excessive. It should be noted the City devoted approximately one-and-a-half pages of its 73-page brief to this issue and apparently does not consider this to be a significant point.

V. DID THE DISTRICT COURT ERR IN ORDERING THE CITY OF KANSAS CITY TO INDEMNIFY FIREMEN JACKSON AND DEKEYSER AND TO PAY THEIR ATTORNEY FEES?

In reliance on K.S.A. 1983 Supp. 75-6109, the City contends Jackson and DeKeyser (the two drivers) did not cooperate in good faith in the defense of the claims brought against them and hence the City should not have been ordered to indemnify them. The City also argues it was error for the district court to have ordered the City to pay these firemen's attorney fees.

We shall first consider the matter of indemnification. Jackson brought an action against DeKeyser and the City. DeKeyser filed a counterclaim against Jackson in this action. Jackson and DeKeyser are defendants in the actions filed by Kitchen and Freeman. Jackson and DeKeyser were each found 35 percent at fault by the jury.

K.S.A. 1983 Supp. 75-6109 provides:

*"Except as otherwise provided in the Kansas [tort] claims act, a governmental entity is liable, and shall indemnify its employees against damages, for injury or damage proximately caused by an act or omission of an employee while acting within the scope of his or her employment.* A governmental entity shall not be liable under the provisions of this act for any punitive or exemplary damages against an employee, nor for payment of any costs, judgments or settlements which are paid through an applicable contract or policy of insurance. *The governmental entity shall have the right to recover any payments made by it for any judgment, or portion thereof, and costs or fees incurred by or on behalf of an employee's defense if the employee fails to cooperate in good faith in the defense of the claim or action or if the trier of fact finds that the act or omission of the employee was because of such employee's actual fraud or actual malice."* (Emphasis supplied.)

As previously stated, the City contends Jackson and DeKeyser did not cooperate in good faith in the defense of the actions within the meaning of K.S.A. 1983 Supp. 75-6109 and hence are not entitled to indemnification. The statute speaks of the "right to recover" from the employee payments on judgments, etc., if the employee has not cooperated in good faith, rather than the refusal to pay in the first place. The effect of this is the City's obligation to pay the injured party is unaffected by any lack of cooperation by the employee. The parties, however, raise no issue on this facet of the statute.

DeKeyser and Jackson were seeking damages for their own personal injuries as well as defending against actions brought against them.

According to the City, it was understandable that had either of these claimants cooperated fully in the defense of these actions, they would have been doing so at the expense of their own

claims. "While claimants' refusal to cooperate is understandable," the City declares, "it is not legally justifiable under [K.S.A. 1983 Supp. 75-6109]." We do not believe the fact the same employees were both claimants and defendants in the complex litigation arising from the collision renders them guilty, as a matter of law, of failing "to cooperate in good faith in the defense" within the meaning of K.S.A. 1983 Supp. 75-6109 and hence not entitled to indemnification. The City has not shown any failure by the two firemen to cooperate above and beyond acts necessary for prosecution of their own claims. We conclude the trial court did not err in ordering the City to indemnify Jackson and DeKeyser.

We turn now to whether the trial court erred in ordering certain attorney fees be paid on behalf of Jackson and DeKeyser.

K.S.A. 1983 Supp. 75-6108 states:

"(a) Upon request of an employee in accordance with subsection (e), a governmental entity shall provide for the defense of any civil action or proceedings against such employee, in his or her official or individual capacity or both, on account of an act or omission in the scope of his or her employment as an employee of the governmental entity, except as provided in subsection (c).

"(b) A governmental entity may provide for a defense by its own attorney or by employing other counsel for this purpose or by purchasing insurance which requires that the insurer provide the defense. A governmental entity has no right to recover such expenses from the employee defended, except as provided in K.S.A. 1982 Supp. 75-6109.

"(c) Except as provided in K.S.A. 75-4360, *a governmental entity may refuse to provide for the defense of an action against an employee if the governmental entity determines that:*

"(1) The act or omission was not within the scope of such employee's employment;

"(2) such employee acted or failed to act because of actual fraud or actual malice;

"(3) *the defense of the action or proceeding by the governmental entity would create a conflict of interest between the governmental entity and the employee;* or

"(4) the request was not made in accordance with subsection (e).

"(d) *If after a timely request in accordance with subsection (e), a governmental entity fails or refuses to provide an employee with a defense and the employee retains his or her own counsel to defend the action or proceeding, such employee is entitled to recover from the governmental entity such reasonable attorney's fees,* costs and expenses as are *necessarily incurred in defending the action* or proceeding if the action or proceeding arose out of an act or omission in the scope of employment as an employee of the governmental entity, *but such employee is not entitled to such reimbursement if the trier of fact finds that such employee acted or failed to act because of actual fraud or actual malice.*

"Nothing in this section shall be construed to deprive an employee of the right to petition a court of competent jurisdiction to compel the governmental entity or the governing body or an employee thereof to perform the duties imposed by this section.

"(e) An employee's request for a governmental entity to provide for the defense of the employee shall be made in writing within fifteen (15) days after service of process upon the employee in the action. In actions involving employees of the state, such request shall be filed in the office of the attorney general. In actions involving employees of a municipality, such request shall be filed with the governing body thereof or as otherwise provided by such governing body. A governmental entity, in its discretion, may provide requested defense for any of its employees who failed to make a request within the time prescribed by this subsection." (Emphasis supplied.)

The circumstances surrounding these attorney fee situations are different as to each of the two firemen. However, no claim is made that either attorney fee is excessive or that either fee was incurred other than in defense of the actions.

We shall first consider the issue as it relates to DeKeyser.

On March 16, 1983, DeKeyser and the City filed a stipulation of the facts to be considered by the court in determining the attorney fee issue. The Stipulation of Facts is as follows:

"1. That the defendant Thomas DeKeyser was, at all times involved in the above case, an employee of the City of Kansas City, Kansas Fire Department.

"2. That Charles Fay was, in September of 1980, a direct superior of Mr. DeKeyser at the City of Kansas City, Kansas Fire Department.

"3. That the Mayor of the City of Kansas City, Kansas has direct jurisdiction of the City of Kansas City, Kansas Fire Department.

"4. That in September of 1980, after being served with process in the above-captioned case, Mr. DeKeyser conferred with Mr. Fay about legal representation. Mr. Fay in turn approached the office of the Mayor of the City of Kansas City, Kansas in regard to whether the City would provide legal representation for Mr. DeKeyser. Mr. Fay was told by the Mayor's office to instruct Mr. DeKeyser to hire an attorney and that the attorney fees incurred in the defense of the action would be paid by the City of Kansas City, Kansas.

"5. Mr. DeKeyser entered an agreement with Rodney L. Turner for Mr. Turner to represent his interests in the above-captioned cases on or about the 27th day of September, 1980. The representation agreement was not based upon a contingency fee or agreed upon fee of any sort.

"6. The City of Kansas City, Kansas had full knowledge at all times that Rodney L. Turner was not being paid an attorney's fee by Mr. DeKeyser for defense of Mr. DeKeyser in the above action.

"7. Mr. Turner formally requested the City of Kansas City, Kansas to assume Mr. DeKeyser's defense in the above-captioned cases and to indemnify him for any judgments taken against him and any attorney fees he incurred in a letter to the City of Kansas City, Kansas, dated November 7, 1980, a copy of which is attached hereto as Exhibit A.

"8. Daniel B. Denk responded by letter dated November 10, 1980, by saying that the City would not assume his defense and would be governed by the provisions of K.S.A. 75-6101 et seq. on the question of indemnification of Mr. DeKeyser for his legal fees and any judgments taken against him. The letter also advised Mr. Turner to keep accurate time records reflecting separate time spent for the defense of Mr. DeKeyser as opposed to defending or pursuing any other actions on his behalf. A copy of Mr. Denk's letter is attached hereto as Exhibit B.

"9. Mr. DeKeyser requested the City of Kansas City, Kansas, to assume the responsibility for all his legal fees incurred in his defense of the above-captioned cases in a letter to Daniel B. Denk dated December 9, 1980, a copy of which letter is attached hereto and marked as Exhibit C.

"10. Daniel B. Denk responded by letter dated December 17, 1980, by saying that the City would not assume his defense and would be governed by the provisions of K.S.A. 75-6101 et seq. on the question of indemnification of Mr. DeKeyser for his legal fees and any judgments taken against him. The letter also advised Mr. Turner to keep accurate time records reflecting separate time spent for the defense of Mr. DeKeyser as opposed to defending or pursuing any other actions on his behalf. A copy of Mr. Denk's letter is attached hereto as Exhibit D.

"11. On January 21, 1981, Daniel B. Denk, in response to a letter from David R. Hills advised Mr. Turner, by carbon copy, that the City would not assume the defense of Mr. DeKeyser in regard to the suit filed by Dan S. Freeman, the same response as Mr. Denk had given in the previous letters. A copy of Mr. Denk's letter is attached hereto as Exhibit E.

"12. On August 17, 1981, Mr. DeKeyser filed a cross-claim against the City of Kansas City, Kansas.

"13. That Rodney L. Turner did defend the defendant Thomas DeKeyser throughout all proceedings involved in this case, including trial, and has submitted a bill for his services rendered in said defense in the amount of Twelve Thousand Two Hundred Thirty Six Dollars and Twenty-Five One Hundredths ($12,236.25).

"14. That Rodney L. Turner was advised by Daniel B. Denk, the attorney representing the City of Kansas City, Kansas in this action, that Mr. Denk was receiving $50.00 an hour from the City of Kansas City, Kansas for his services and that Mr. Turner should use that same figure in submitting his fees for the defense of Mr. DeKeyser.

"15. It is the position of the City of Kansas City, Kansas that the City Attorney of Kansas City, Kansas and his assistants were and are unable to represent Thomas G. DeKeyser due to potential conflict of interest in any of the above-captioned cases.

"16. That Rodney L. Turner joined in the defense of the City throughout the trial of the above consolidated cases."

Under these stipulated facts we find no error in the trial court's order directing the City to pay DeKeyser's attorney fees. Clearly, it would have been error for the trial court to hold otherwise.

As to Jackson, his attorney submitted a bill for $763.75 for defending the actions against his client. No claim was made for attorney fees incurred in prosecuting Jackson's claims. No issue

is made over whether the attorney fees charged were in fact incurred in the defense of the cases. The City contends the existence of the Jackson claim against the City was a conflict of interest barring allowance of attorney fees. We believe the City's reliance on K.S.A. 1983 Supp. 75-6108(c)(3) is misplaced. Where the employee and employer have conflicting interests in the litigation and the city cannot provide representation for the employee through its own legal department or hire an attorney for the employee, then the employee must select his own attorney. This does not mean the city is immune from paying for the cost thereof. Indeed, K.S.A. 1983 Supp. 75-6108(d) specifically provides that where defense has been denied and an attorney hired by the employee, the employee is to be reimbursed for the costs of same unless "the trier of facts finds that such employee acted or failed to act because of actual fraud or actual malice." No such finding was made by the trier of fact or, apparently, requested by the City.

We conclude the trial court did not err in ordering the City to pay the attorney fees for Jackson.

VI. DID THE DISTRICT COURT ERR IN THE CONDUCT OF THE TRIAL INCLUDING, BUT NOT LIMITED TO, THE GIVING OR REFUSING OF ITS INSTRUCTIONS, DENIAL OF THE CITY'S MOTION FOR MISTRIAL AND/OR NEW TRIAL AND THE MAKING OF CERTAIN EVIDENTIARY RULINGS, AND WHETHER SUCH ERROR WAS PREJUDICIAL TO THE CITY?

The City does not address this issue in its brief. We conclude it was intended to be nothing more than the aggregate of all the issues previously determined herein, and, accordingly, warrants no additional discussion.

VIII. DID THE TRIAL COURT ERR IN RULING THE KANSAS TORT CLAIMS ACT (K.S.A. 1983 SUPP. 75-6101 *ET SEQ.*) SET A MAXIMUM LIMIT OF LIABILITY FOR CLAIMS ASSERTED AGAINST GOVERNMENTAL EMPLOYEES?

This issue is raised by Freeman, Jackson and Kitchen, cross-appellants herein.

As previously noted, on the date of the collision, September 10, 1979, the applicable version of the Kansas Tort Claims Act

appeared at K.S.A. 1979 Supp. 75-6101 *et seq.* At that time K.S.A. 1979 Supp. 75-6105(*a*) provided:

"Subject to the provisions of K.S.A. 1979 Supp. 75-6111, the liability *of a governmental entity* for claims within the scope of this act shall not exceed five hundred thousand dollars ($500,000) for any number of claims arising out of a single occurrence or accident." (Emphasis supplied.)

K.S.A. 1983 Supp. 75-6109 imposes upon a governmental entity the obligation to indemnify an employee. The statute provides:

"Except as otherwise provided in the Kansas [tort] claims act, a governmental entity is liable, and shall indemnify its employees against damages, for injury or damage proximately caused by an act or omission of an employee while acting within the scope of his or her employment."

Claimants contend while K.S.A. 1979 Supp. 75-6105(*a*) established a maximum liability on a governmental entity for its negligence of $500,000.00, it did not impose a maximum liability upon awards against negligent employees and, therefore, pursuant to K.S.A. 1983 Supp. 75-6109, the City could be made to pay more than $500,000.00 to indemnify its negligent employees. In the instant action the aggregate value of all claims far exceeded $500,000.00.

On cross-appeal plaintiffs contend the district court erred in holding the maximum damage award was $500,000.00. The rationale of the district court is as follows:

"The additional issue of limitation of liability has been briefed by the parties. K.S.A. 75-6105, as originally enacted, stated that the 'liability of a governmental entity for claims within the scope of' the tort claims act shall not exceed $500,000.00 for any number of claims arising out of a single occurrence or accident. During the 1980 legislative session the statute was amended by deleting the words 'governmental entity.' The original enactment was prior to the accident in question and the effective date of the amendment (April 11, 1980) was [seven] months after the accident.

"Plaintiffs contend that K.S.A. 75-6105, as originally enacted, limited only the liability of a governmental entity and did not limit liability as to employees of the entity. If so, then that statute was clearly in conflict with the provisions of K.S.A. 75-6109 prior to the 1980 amendment. K.S.A. 75-6109 requires the governmental entity to indemnify, without limit, its employees against damages for injury or damages proximately caused by an act or omission of an employee while acting within the scope of his or her employment. Plaintiffs, of course, now argue that the provisions of K.S.A. 75-6109 should control and that defendant City of Kansas City, Kansas, should be held liable for indemnification to its employees regardless of the amount of judgment rendered.

"In *Southeast Kansas Landowners Ass'n v. Kansas Turnpike Auth.,* 224 Kan. 357, 367, 582 P.2d 1123, the Supreme Court set forth the rules governing the judicial construction of acts of the legislature as follows:

" '. . . The fundamental rule of statutory construction, to which all others are subordinate, is that the purpose and intent of the legislature governs when the intent can be ascertained from the statutes.

" 'In determining legislative intent, courts are not limited to a mere consideration of the language employed, but may properly look to the historical background of the enactment, the circumstances attending its passage, the purposes to be accomplished, and the effect the statute may have under the various constructions suggested.

" 'In construing a statute, the legislative intention is to be determined from a general consideration of the whole act. Effect must be given, if possible, to the entire statute and every part thereof. To this end it is the duty of the court, so far as practicable, to reconcile the different provisions so as to make them consistent, harmonious, and sensible.

" 'The wisdom, justice, and expediency of legislation is not for judicial determination.' (Citations omitted.)

"A general review and consideration of the entire torts claims act reveals that the legislature intended to give injured parties a cause of action against both the governmental entity and its negligent employees, subject to certain limitations. One of the limitations clearly announced by the legislature was a limitation of liability against the governmental entity not to exceed $500,000.00, for any number of claims arising out of a single occurrence or accident. The act also provides, under K.S.A. 75-6107, that there can be only one action commenced by reason of the same subject matter, and that a judgment against the governmental entity shall be a bar to a subsequent action against its employees and *vice versa.* Also, pursuant to K.S.A. 75-6109, the governmental entity is liable, and shall indemnify its employees against damages for injury or damage proximately caused by an act or omission of an employee while acting within the scope of his or her employment.

"There is no conflict in the provision of the act, as above stated, unless we assume that the legislature did not originally intend to limit the liability of employees of a governmental entity. Although K.S.A. 75-6105, as originally enacted, did not state that employees would be personally liable for judgments in excess of $500,000.00, the statute did not specifically limit their liability *as it did* the governmental entity. If, as plaintiffs argue, the legislature did not intend to limit the employees' liability as it specifically limited the liability against the governmental entities, K.S.A. 75-6105(*a*), as originally enacted, is clearly in conflict with the indemnification provisions of K.S.A. 75-6109.

" "I am convinced that the legislature did not intend to hold either a governmental entity or any of its employees acting within the scope of their employment liable for any amount in excess of $500,000.00 [for] any single accident or occurrence. I believe that the words 'of a governmental entity' were inadvertently placed in subsection (*a*) of K.S.A. 75-6105 without the realization that such verbiage created a conflict with the indemnification provision of K.S.A. 75-6109 and with the general intent of the act. The legislature promptly acted at its next session to remedy the apparent conflict, and the 1980 amendment was simply a clarification of the clear intent of the act. Therefore, plaintiffs herein will be limited to the sum of $500,000.00 against both the city and its employees acting within the scope of their authority for all claims arising out of this accident."

As the above passage from the district court reveals, the 1980 legislature amended K.S.A. 1979 Supp. 75-6105(a) by striking "of a governmental entity." K.S.A. 1980 Supp. 75-6105(a), as amended, reads:

"Subject to the provisions of K.S.A. 1980 Supp. 75-6111, the liability for claims within the scope of this act shall not exceed five hundred thousand dollars ($500,000) for any number of claims arising out of a single occurrence or accident."

The provision has not been amended subsequently. See K.S.A. 1983 Supp. 75-6105(a).

The action of the 1980 legislature was possibly prompted by an article written by Mr. Jerry Palmer, which appeared in the Winter, 1979, issue of The Journal of the Kansas Bar Association. Mr. Palmer, who had represented the Kansas Trial Lawyers Association before the 1979 legislature when it was debating the enactment of the Kansas Tort Claims Act, wrote:

"An *interesting possibility* arises when we note that the governmental entity is restricted to this amount [$500,000] but that there is no comparable lid for employees. Yet the section dealing with the cost of defense and the payment of claims provides: '. . . (A) governmental entity is liable, and shall indemnify its employees against damages, for injury or damages proximately caused by an act or omission of an employee while acting within the scope of his or her employment.' There is no provision there that relates back to the [$500,000] statutory limitation and thus it is *possible, through making an employee liable for more than the statutory limit, that the entity would have to indemnify the employee for sums in excess of the statutory limitation.*" Palmer, *A Practitioner's Guide to the Kansas Tort Claims Act,* 48 J.K.B.A. 299, 310 (1979). (Emphasis supplied.)

Other commentators picked up on Mr. Palmer's "interesting possibility." Comment, *Survey of Kansas Law: Civil Procedure,* 29 Kan. L. Rev. 449 (1981); Comment, *The Kansas Tort Claims Act and School Districts,* 28 Kan. L. Rev. 619, 622 (1980).

The 1980 legislative action on K.S.A. 1979 Supp. 75-6105(a) appeared in Senate Bill No. 534. The bill, as introduced, made additions to the statute relative to limited action cases and small claims. The additions to the statute are emphasized as follows:

"(*b*)(1) Except as otherwise provided in this act, *either* the code of civil procedure *or, subject to provision (2) of this subsection, the code of civil procedure for limited actions* shall be applicable to actions within the scope of this act. *Actions for claims within the scope of the Kansas tort claims act brought*

*under the code of civil procedure for limited actions are subject to the limitations provided in K.S.A. 1979 Supp. 61-1603.*

*"(2) Actions within the scope of the Kansas tort claims act may not be brought under the small claims procedure act."*

On January 22, 1980, the bill was called for hearing before the Senate Judiciary Committee. The minutes reveal the following occurred:

"No one testified either in support of or in opposition to the bill. Jerry Stephens [a staff member] again reviewed the provisions of the bill. Committee discussion followed. *During discussion, some members indicated that they had thought that the tort claims act provided maximum recovery for $500,000, whether that was against a governmental entity or against an employee of the governmental entity.*

. . . .

"The staff was . . . requested to prepare amendatory language to the bill which would provide that the maximum recovery would be $500,000, whether it was against an entity or an employee, and also whether there was more than one entity involved." Minutes of the 1980 Senate Judiciary Committee, January 22, 1980, pp. 1-2. (Emphasis supplied.)

The February 15, 1980, minutes of the Senate Judiciary Committee reflect Senate Bill No. 534 was amended to delete the phrase "of a governmental entity" from K.S.A. 1979 Supp. 75-6105(*a*). Senate Bill No. 534 passed both chambers unanimously and on April 8, 1980, was signed by the Governor. Kansas Legislative Information Services 1980 Senate and House Actions Report and Subject Index Report, p. 39. It became law on April 11, 1980, upon its publication in the official state paper. L. 1980, ch. 294, sec. 4.

In interpreting legislative acts it must be remembered where a statute is susceptible of more than one construction, it must be given that construction which, when considered in its entirety, gives expression to its intent and purposes, even though such construction is not within the strict literal interpretation of the statute. *Reeves v. Board of Johnson County Comm'rs*, 226 Kan. 397, 402, 602 P.2d 93 (1979); *State v. V. F. W. Post No. 3722*, 215 Kan. 693, 697, 527 P.2d 1020 (1974). Further, it is the duty of a court, in ascertaining legislative intent, to reconcile—where so far as possible—various conflicting provisions of the act in order to make them consistent, harmonious, and sensible. *Eurich v. Alkire*, 224 Kan. 236, 238, 579 P.2d 1207 (1978); *Jordan v. Doonan Truck & Equipment Inc.*, 220 Kan. 431, 434, 552 P.2d 881 (1976). In keeping therewith, when the interpretation of one

section of an act according to the exact and literal import of its words would contravene the manifest purpose of the legislature, the entire act should be construed according to its spirit and reason, disregarding so far as may be necessary the strict letter of the law. *State v. Dumler,* 221 Kan. 386, Syl. ¶ 2, 559 P.2d 798 (1977).

In determining legislative intent, courts are not limited to a mere consideration of the language employed, but may properly look into the historical background of the enactment, the circumstances attending its passage, the purposes to be accomplished and the effect the statute may have under various suggested constructions. *Southeast Kansas Landowners Ass'n v. Kansas Turnpike Auth.,* 224 Kan. 357, 367, 582 P.2d 1123 (1978). A statute should never be given construction that leads to uncertainty, injustice or confusion, if possible to construe it otherwise. In construing a statute words and phrases should be construed according to context and the approved usage of the language, and words in common use are to be given their natural and ordinary meaning. *Coe v. Security National Ins. Co.,* 228 Kan. 624, Syl. ¶ 2, 620 P.2d 1108 (1980). It should be remembered that legislative interpretation is a question of law. *Coleman v. Brotherhood State Bank,* 3 Kan. App. 2d 162, 171, 592 P.2d 103 (1979).

A brief discussion of the legislative history of the initial enactment of the Kansas Tort Claims Act (Substitute Senate Bill No. 76 [1979]) is necessary for inclusion herein. As would be expected on pending legislation of this magnitude, many citizens of Kansas and organizations participated in the hearings held thereon. Two of the leaders, holding views in opposition to each other, were E. A. Mosher, Executive Director of the League of Kansas Municipalities, and Jerry R. Palmer on behalf of the Kansas Trial Lawyers Association. One of the principal bones of contention was the maximum limit of liability of governmental entities for all claims arising out of a single occurrence or accident. Originally $300,000.00 was the stated limit. Limits of $500,000.00 and $1,000,000.00 were discussed. As enacted, the limit was fixed at $500,000.00 (K.S.A. 1979 Supp. 75-6105).

We have examined the legislative history surrounding the enactment of the Kansas Tort Claims Act and have failed to find any reference to any discussion relative to a governmental em-

ployee having unlimited exposure to judgment for actual damages while a governmental entity has a $500,000.00 limitation on liability. If governmental employees were intended to be left "swinging in the breeze," so to speak, for excess judgments (involving actual damages as opposed to punitive damages) or if a governmental entity could be subjected to paying more than $500,000.00 through indemnification of its employees, it would be reasonable to assume at least some mention relative thereto would have been made in the hotly contested hearings involving the proposed legislation.

With these rules of statutory construction in mind, we conclude the district court did not err in holding the 1980 amendment to K.S.A. 1979 Supp. 75-6105 was simply a clarification of the existing law. We further conclude, as did the district court, the $500,000.00 limitation of liability set forth in K.S.A. 1979 Supp. 75-6105 is equally applicable to a governmental entity and its employees for all claims arising out of a single occurrence or accident. To hold otherwise would defeat the clearly intended limitation of liability, as a claimant could avoid the $500,000.00 limit by simply asserting his claim against both the negligent employee and the governmental entity rather than just the governmental entity. The governmental entity then would end up paying the full amount of judgment in excess of the $500,000.00 limit, by virtue of the indemnification requirements of K.S.A. 1983 Supp. 75-6109, thereby defeating the governmental entity's statutory limit of liability. If the indemnification statute were to be held subject to the $500,000.00 limitation but judgments against employees were not, the employee would be exposed to a personal excess judgment for actual damages. Either of these results, we believe, would be contrary to the purpose, design and objective of the Kansas Tort Claims Act.

The $500,000.00 limit of liability contained in K.S.A. 1983 Supp. 75-6105 is, of course, inapplicable where insurance has been purchased providing greater coverage pursuant to K.S.A. 1983 Supp. 75-6111.

The judgment is affirmed.