No. 56,099

HESSTON CORPORATION, *Appellant*, v. STATE OF KANSAS EMPLOYMENT SECURITY BOARD OF REVIEW and WELDON BACHMAN, *et al.*, PAUL H. WENGER, *et al.*, and JOYCE LEE, *Appellees*.

(684 P.2d 388)

Opinion filed June 8, 1984.

*Robert D. Overman*, of Martin, Churchill & Overman, of Wichita, argued the cause and was on the briefs for appellant.

*Marlin A. White*, of Topeka, argued the cause and was on the brief for appellee State of Kansas Employment Security Board of Review.

*William H. Seiler, Jr.*, of Bremyer & Wise, P.A., of McPherson, argued the cause and was on the brief for appellees Bachman, *et al.*, Wenger, *et al.*, and Lee.

The opinion of the court was delivered by

MILLER, J.: This is an appeal by an employer, Hesston Corporation, from a judgment of the Harvey County District Court, finding the individual defendants, Hesston employees, eligible for unemployment benefits under the Kansas Employment Security Law, K.S.A. 44-701 *et seq.* The separate claims of some sixty-four Hesston employees are before us in this consolidated appeal. The issues raised by Hesston are four:

(1) Whether employees who took vacation with pay during a two-week plant shutdown are eligible to receive unemployment benefits for the shutdown time;

(2) whether employees who did not use any vacation time during the two-week shutdown were eligible for unemployment benefits for the shutdown time;

(3) whether employees who did not seek other work during the two-week shutdown time were eligible for unemployment benefits;

(4) whether the Secretary of the Department of Human Resources can waive the work search requirements of K.S.A. 44-705.

The facts are not in dispute and have been stipulated by the parties. On November 6, 1981, Hesston notified all employees that its Hesston, Kansas, plant would close for two weeks following the normal Christmas holiday closing. Hesston gave the following notice to all employees:

"TO ALL HESSTON EMPLOYEES

"Retail sales of farm equipment during the last two months have been much lower than was originally expected and as a result, it has become necessary to adjust production levels, inventories, and overhead expenses to compensate for this reduction in sales. In order to accomplish this reduction, the Hesston location plant and offices will be closed for an additional two (2) weeks following the normal Christmas holiday closing. Production will cease with the close of second shift operations December 23, 1981 and will reopen Monday, January 18, 1982 at 12:01 A.M.

"Holiday pay will be paid during the normal Christmas shutdown for those employees who otherwise qualify. It is expected that all employees will utilize their earned but unused vacation time during the following shutdown period. Employees who do not have remaining unused vacation time, but whose anniversary date falls within three (3) months after the shutdown period may count that time as 'vacation leave' and receive vacation pay after passing their next anniversary date. Employees who do not have either unused vacation time or an anniversary date that falls within three (3) months after that shutdown period will receive time off without pay. Additionally, for the production areas only, a second production shutdown is tentatively being planned for the first two weeks in August, 1982.

"Although this second shutdown is still tentative and is some distance in the future, we are communicating the information at this time so that those affected can make their plans accordingly."

The "normal Christmas holiday closing" was from December 23, 1981, to January 3, 1982. The economic shutdown announced in the notice occurred, and the plant was shut down from January 4 through January 15, 1982.

All of the individual defendants in this case are Hesston employees, and all of them were covered by a collective bar-

gaining agreement which was effective during the shutdown period. That agreement provides in substance that, within certain limits, the employees may choose their vacation time. The agreement provides:

"29. VACATION SCHEDULING. Vacation as provided for herein shall be granted and taken during the twelve (12) months immediately following each employee's anniversary day of employment; and shall be scheduled, when reasonably possible, at times most desired and requested by the employees. The Company and the Union shall establish a mutually agreeable protected period during which a senior employee cannot replace a junior employee who has already scheduled a vacation. Except for this protected period, vacations will be scheduled based on seniority, provided they do not interfere with the orderly and efficient continuation of production. It is understood that the final right to allot vacation periods and to change such allotments is reserved to the Company in order to insure the orderly operation of the plant."

There is a further agreement between union and management which implements paragraph No. 29 of the collective bargaining agreement. It reads:

"To implement paragraph #29, Vacation Scheduling, of the collective bargaining agreement, the Company and Union agree to the following general policy and procedure:

"1.  By January 1 of each year, the Company shall provide to its supervisors a general outline of the vacation allotments for the coming calendar year within each department.

"2.  By February 15, the department supervisors shall contact all employees in their departments who are eligible for vacations during the year, to determine when individual vacations are desired and how they can be scheduled in accordance with both seniority and production efficiency. Employees may request desired vacation times from their supervisors during this period.

"3.  When a vacation is requested more than 60 days prior to the day it is to begin, preference shall be given to seniority in making the vacation assignment, subject to production considerations.

"4.  Once an employee schedules a vacation and it is approved by the Company, that vacation may not be changed by either the employee or the Company within the sixty (60) day period prior to the start of the vacation except with the mutual consent of the employee and the supervisor.

"5.  Vacation requests made by employees within 60 days from the beginning of the requested vacation period, shall be processed on a first come, first served, basis, subject to production requirements."

A large number of Hesston employees filed claims for unemployment compensation for all or part of the shutdown period. They were told by the Department of Human Resources that they were not required to seek other employment during this

two-week shutdown. Upon hearing the claims, the Examiner found against all of the employees who had applied, and denied benefits. Some of the applicants did not appeal. All of the individual defendants in this case did appeal; the Referee reversed the Examiner, and granted benefits. Hesston then appealed to the Board of Review, which upheld the Referee's decision. Hesston appealed to the district court, which in turn upheld the Board's decision in favor of the employees.

Hesston's employees fall into five distinct groups, the first two of which are not parties to this action:

1. Those who had two weeks of vacation time coming, took it during the layoff, received vacation pay, and did not file for unemployment compensation.
2. Those who filed for unemployment compensation, were denied benefits by the examiner, and did not appeal that decision.
3. Those who were entitled to no accrued vacation time with pay, at the time of the shutdown.
4. Those who had varying periods of accrued vacation time coming, but who elected to take it at times other than during the shutdown.
5. Those who had some accrued vacation time coming, and who elected to take it during the first week of the shutdown, and either used it all up at that time or elected to take the rest of their vacation at some later time. These people filed for and were awarded unemployment compensation for the second week of the shutdown only.

The individual defendants include those who fall into groups No. 3, 4 and 5 above. None of the individual defendants are claiming unemployment compensation benefits for periods during which they were actually paid vacation pay by Hesston.

We turn first to the third and fourth issues as stated above. Hesston contends that K.S.A. 44-705 requires an unemployed worker to make an active search for other work, that an employee who does not seek other work is not eligible for unemployment benefits, and that the Secretary of the Department of Human Resources cannot waive the "work search" requirements of K.S.A. 44-705.

That statute reads as follows:

"44-705. . . . An unemployed individual shall be eligible to receive ben-

efits with respect to any week only if the secretary, or a person or persons designated by the secretary, finds that:

"(a) The claimant has registered for work at and thereafter continued to report at an employment office in accordance with rules and regulations adopted by the secretary, except that, subject to the provisions of subsection (a) of K.S.A. 44-704 and amendments thereto, the secretary may adopt rules and regulations which waive or alter either or both of the requirements of this subsection (a).

"(b) The claimant has made a claim for benefits with respect to such week in accordance with rules and regulations adopted by the secretary.

"(c) The claimant is able to perform the duties of his or her customary occupation or the duties of other occupations for which the claimant is reasonably fitted by training or experience, and is available for work, as demonstrated by his or her pursuit of the full course of action most reasonably calculated to result in his or her reemployment . . . ."

We note that this section was amended by the legislature in 1982 (see K.S.A. 1983 Supp. 44-705), but the amendments to the portions quoted above do not change the thrust of the provisions here involved. Hesston argues that the Secretary is specifically authorized to adopt rules which waive or alter either or both of the requirements of subsection (a), but that the Secretary is not authorized to "waive" the provisions of subsection (c), which includes the "work search" requirements.

Several other statutes also need to be considered. K.S.A. 44-702 sets forth a declaration of the public policy of this state: protection against involuntary unemployment. K.S.A. 44-703(m) defines "unemployment":

"An individual shall be deemed 'unemployed' with respect to any week during which such individual performs no services and with respect to which no wages are payable to such individual . . . ."

Two of the Kansas Administrative Regulations relating to unemployment insurance are as follows. K.A.R. 50-1-4 defines various terms. It reads in part:

"(a) *Types of unemployed workers.* An unemployed individual may be classified, as the terms are used in these regulations, as a totally unemployed worker, a part-totally unemployed worker, a temporarily unemployed worker, or a partially unemployed worker . . . .

. . . .

"(3) *Temporary unemployment.* A totally or part-totally unemployed worker shall be considered to be temporarily unemployed for a period not to exceed four consecutive weeks, if he has been laid off due to lack of work by an employing unit for which he has worked full time and for which he expects to again work full time, provided that his employment with such employing unit, although temporarily suspended, has not been terminated.

K.A.R. 1982 Supp. 50-3-2(e) provides:

"(e) *New claims*. A new claim for benefits shall be filed on a form entitled unemployment insurance application which shall set forth that the worker has registered for work, the dates and reasons for separation from recent employment, and such other information as prescribed by the division in the form. A new claim for benefits filed by a . . . temporarily unemployed worker shall constitute his or her registration for work. Claims personnel will give each claimant such necessary and appropriate assistance as they reasonably can, including referral to the public employment office most accessible to him or her.

"Those temporarily unemployed . . . may be excused from registration for work."

The employees in this case were "temporarily unemployed" as defined in K.A.R. 50-1-4(3). They were laid off for a period of two consecutive weeks due to "lack of work by an employing unit," for which each had worked full time, and for which each employee expected to again work full time. The claim filed by each temporarily unemployed claimant constituted that employee's registration for work. K.A.R. 1982 Supp. 50-3-2(e). The employees here involved had filed claims and thus had registered for work; yet, Hesston contends that the employees were required to search for a job because of the unwaivable provisions of K.S.A. 44-705(c), which require them to pursue "the full course of action most reasonably calculated to result in . . . reemployment . . . ." In support of its contention, Hesston cites *Chadwick v. Employment Security Board of Review*, 192 Kan. 769, 390 P.2d 1017 (1964), and *Clark v. Board of Review Employment Security Division*, 187 Kan. 695, 359 P.2d 856 (1961). Both cases are distinguishable. *Chadwick* involved a claimant who had worked for Southwestern Bell Telephone Company at Olathe. She was placed on pregnancy leave in October 1961. Some months later she requested a transfer to the office at Parsons, Kansas, where she had moved with her husband. Southwestern Bell was unable to place her at that location because others with more seniority were on the waiting list for jobs. She made only minimal efforts to secure other employment. In *Clark*, the claimant, having reached the mandatory retirement age of sixty-five, was retired from his employment with Skelly Oil Company in El Dorado. Thereafter, he drew retirement compensation from Skelly in addition to Social Security benefits. Neither Chadwick nor Clark were temporarily unemployed; neither was laid off for a short period of time due to

a temporary closing of the employment facility; neither case has any facts bearing any significant similarities to the case at hand. The employees here, as we previously noted, were registered for work by virtue of their unemployment claims. They were not permanently discharged or laid off, but were assured that they would be returned to their regular work at the close of the two-week shutdown. The shutdown was mandated by the company because of a reduction in retail sales and the necessity of adjusting production levels, inventories, and overhead expenses. We cannot say that the action by the claimants in waiting until the plant reopened, and in registering for work, was not the action "most reasonably calculated to result in [their] reemployment." A requirement that the employees each make individual search for temporary work during a temporary shutdown does not appear reasonable, and is not required by K.S.A. 44-705(c). Hesston does not argue (under that statute) that the employees were unable to perform the duties of their customary occupations, or that they were not reasonably fitted by training or experience for other occupations; and it does not argue that they were unavailable for work. We conclude that employees who are temporarily unemployed due, as here, to a short and temporary economic shutdown are not required to do more then "register for work." The action of the employees was reasonably calculated to result in reemployment.

Turning to Hesston's argument that the Secretary of the Department of Human Resources cannot waive the work search requirements of K.S.A. 44-705, we find that the regulations are reasonable under the circumstances. The Secretary has not "waived" the requirements of that statute, but instead has simply read the statute rationally with reference to employees who are temporarily unemployed. A worker whose job has been terminated, and who is not merely subject to a temporary work stoppage, is in an entirely different position. We find the Secretary's interpretation of the act, and the quoted regulation, reasonable and not contrary to the statute.

We turn now to the first two issues raised—whether employees who took vacation with pay during the first week of the two-week plant shutdown are eligible to receive unemployment benefits for the second week of shutdown time, and whether employees who were entitled to vacation time but who did not

use it during the two-week shutdown time, and who elected to take it at other times during the year, were eligible for unemployment benefits during the shutdown time. We have already noted above that none of the employees who are defendants herein took a full two weeks of vacation time and drew vacation pay for that period; hence, the first issue is limited to those who drew vacation pay during the first week and claimed unemployment compensation during the second.

First, Hesston contends that the general rule is that a claimant is not eligible for unemployment compensation benefits while he is receiving vacation pay. Again, as we noted earlier, the employees herein are not claiming unemployment compensation benefits for weeks during which they received vacation pay. As a result, the rule cited by Hesston, which was applied in *Director of Dept. of Ind. Relations v. Butler*, 367 So. 2d 496 (Ala. App. 1979), is not applicable to the fact situation here.

Hesston also contends that employees who drew vacation pay for the first week of the shutdown are ineligible to draw unemployment compensation for the second week because they failed to meet the one-week waiting period provided in K.S.A. 44-705(*d*), which provides:

"44-705. . . . An unemployed individual shall be eligible to receive benefits with respect to any week only if the secretary, or a person or persons designated by the secretary, finds that:

. . . .

"(*d*) The claimant has been unemployed for a waiting period of one week which occurs within the benefit year which includes the week for which the claimant is claiming benefits."

In support of this contention, Hesston cites *Golubski Unempl. Compensation Case*, 171 Pa. Super. Ct. 634, 91 A.2d 315 (1952). That case, like this, involved a two-week plant shutdown. The Pennsylvania court held that the first week for which the employees were not paid constituted the waiting period required by Pennsylvania law, and thus the employees were not entitled to unemployment compensation for that week. Here, the district court affirmed the ruling of the Board of Review, without attaching a copy or quoting from the Board's ruling. No copy of the board's ruling in "one-week claim" cases has been included in the record on appeal. We do not know, and we will not speculate about, the basis upon which the Board allowed compensation. The employees may have had an earlier layoff within the period

of one year; or the Board may have considered the week as the waiting period and allowed compensation at the end thereof; or it may have disallowed compensation but counted that week as a waiting period, making the employees eligible without waiting during the ensuing fifty-one week period in the event of further layoffs. The record does not disclose precisely what action the Board took, or what its reasoning was. It is the duty of an appellant to bring up a complete record of all matters upon which review is sought. *Armstrong v. City of Salina*, 211 Kan. 333, Syl. ¶ 2, 507 P.2d 323 (1973); *Eckdall v. Negley*, 5 Kan. App. 2d 724, Syl. ¶ 1, 624 P.2d 473 (1981). Stated another way, the appellant has the burden of furnishing a record which affirmatively shows that prejudicial error occurred in the trial court. In the absence of such a record, we presume that the action of the trial court was proper. *Jackson v. City of Kansas City*, 235 Kan. 278, 307, 680 P.2d 877 (1984); *State v. Bright*, 299 Kan. 185, 623 P.2d 917 (1981). We conclude that we are unable to determine the waiting period issue on the basis of this record.

We turn now to the final issue: Whether employees who were entitled to vacation time but who did not use it during the two-week shutdown, and who elected to take it at other times during the year, were eligible for unemployment benefits during the shutdown time. This would apply to employees who fall within the fourth and fifth classifications or groups listed earlier in this opinion. Hesston claims that these employees who were entitled to some vacation time and did not take it during the shutdown were not involuntarily unemployed. In discussing this claim, the parties cite *Goodyear Tire & Rubber Co. v. Employment Security Board of Review*, 205 Kan. 279, 469 P.2d 263 (1970). The holding in that case is summarized by paragraph No. 2 of its syllabus:

"Under a collective bargaining agreement which authorized the employer to shut down all or part of its plant for two weeks for vacation purposes, and those employees eligible to a vacation were required to take their vacations during the shutdown period, unless they elected to defer all or part of their vacation to the following year, or had scheduled their vacation for some other time during the vacation year, in which case they were considered on a 'leave of absence,' it is *held*, that employees who elected to take their vacations at some other time than during the shutdown period were *voluntarily unemployed* and, thus, were not eligible for unemployment compensation benefits under the law." (Emphasis in original.)

The collective bargaining agreement involved in this case says nothing about shutdowns. There is a proviso which requires vacations to be taken at times consistent with the orderly and efficient continuation of production; but nothing is said about mandatory use of vacation time during economic or other shutdowns. The agreement, as written and entered into, contemplates sporadic vacationing. We have carefully set forth the provisions of the collective bargaining agreement, and the supplemental agreement between union and management, earlier in this opinion. It is obvious that the employees bargained for and secured the right to take vacations at preselected periods throughout the year, with the consent of their superiors. There is nothing in the agreement which requires the taking of those vacations at the time of any plant shutdown, whether for economic reasons or otherwise. To require all of the employees to take their vacations in early January—immediately following the usual Christmas closing—would thwart the substance and purpose of the collective bargaining agreement.

Under the collective bargaining agreement before us in *Goodyear,* the employer was authorized to shut down all or part of its plant for two weeks for vacation purposes, and employees eligible for a vacation were required to take vacations during the shutdown period, unless they elected to defer all or part of their vacation to the following year, with certain exceptions. The Hesston agreement, however, contains no such provisions, and the employees were not required to take their vacations during the economic shutdown. The terms of the collective bargaining agreement must control. Under the facts before us, we hold that the individual defendants were not "voluntarily unemployed" during Hesston's economic shutdown, as were the employees in *Goodyear,* who were contractually bound to take their vacations during the shutdown period.

We find no error.

The judgment is affirmed.